UNITED TECHNOLOGIES CORPORA-
TION and United Technologies
International, Inc., Plaintiffs,

v.

CITIBANK, N.A., Iranians' Bank and
Telecommunication Company of
Iran, Defendants.

No. 79 Civ. 1192.

United States District Court,
S. D. New York.

March 23, 1979.

Wachtell, Lipton, Rosen & Katz, New York City (Bernard W. Nussbaum, William C. Sterling, Jr., and Claude M. Tusk, New York City, of counsel), for plaintiffs.

Shearman & Sterling, New York City (Henry D. Harfield, Clarence W. Olmstead, Jr., Andrew S. O'Connor, and Mark P. Zimmett, New York City, of counsel), for defendant Citibank, N.A.

## MEMORANDUM DECISION

GAGLIARDI, District Judge.

Plaintiffs United Technologies Corporation and United Technologies International, Inc. (hereinafter collectively "United") commenced this action in New York Supreme Court seeking to enjoin defendant Citibank, N.A. ("Citibank") from making payments on two letters of credit to defendant Iranians' Bank ("Iranians'"). The state court issued a temporary restraining order against Citibank's payment on March 5, 1979. Citibank removed the case to this

court pursuant to 12 U.S.C. § 632 on the following day. This court subsequently extended the duration of the restraining order to permit the parties to brief the difficult issues raised by this case. United has moved for an order remanding the action to state court, or, in the alternative, for a preliminary injunction. For the reasons stated below, both motions are denied.

### Statement of Facts

No evidentiary hearing has been held. The court's findings of fact are made on the basis of the affidavits submitted by United and Citibank. The two Iranian defendants have not yet been served.

The letters of credit which are the subject of this action were both issued in connection with certain contracts pursuant to which United agreed to sell $20 million worth of telephone cable to defendant Telecommunication Company of Iran ("TCI"). The contracts of sale required United, as seller, to procure from Iranians' performance bonds in an amount approximately equal to 10% of the contract price. The contracts also provided for proportionate reductions of the amounts due under the performance bonds within two months of the delivery of each shipment of telephone cable. As an inducement to Iranians' to issue the performance bonds, United procured the issuance by Citibank of two irrevocable letters of credit in the original aggregate amount of $2,003,295 in favor of Iranians'. Letter of Credit No. CK–656061 was issued in the amount of $1,861,245, and letter of credit No. K–312190 was subsequently issued in the amount of $142,050. Iranians', in turn, issued the performance bonds to TCI required by the underlying contracts of sale.

United contends, and it is not disputed, that the contracts of sale have been fully performed on both sides, i. e., that United has delivered all of the cable ordered by TCI and that TCI has paid United the full purchase price of over $20 million. The last shipment under the contracts was allegedly made in August, 1978. TCI has apparently never claimed that there was any failure to perform on United's part. In May, 1977, TCI agreed to a reduction of the performance bonds and of letter of credit No. CK–650061 from $1,861,245 to $1,128,245. No further reduction in the performance bonds or in either of the letters of credit has ever been made, notwithstanding TCI's contractual commitment to reduce and ultimately discharge the bonds to reflect completion of the underlying contracts.

Under the terms of the letters of credit, Iranians' is entitled to draw against Citibank by notifying Citibank by cable either that:

"(A) YOU [Iranians'] WERE REQUIRED TO DISBURSE THE AMOUNT UNDER YOUR UNDERTAKING OR (B) YOUR UNDERTAKING IS STILL OUTSTANDING AT EXPIRATION DATE OF OUR [Citibank's] LETTER OF CREDIT.

The letters of credit further provide that if Citibank is required to pay out any amount to Iranians' under the terms of the letters, Citibank is entitled to be reimbursed by United for that amount. With the consent of all parties the expiration of both letter of credit No. CK–650061 and Iranians' guarantee thereunder was extended to January 9, 1979. Letter of credit No. K–312190 was similarly extended by consent to February 24, 1979.

On December 23, 1978, Iranians' sent the following cable to Citibank with respect to letter of credit No. CK–650061:

OUR GUARANTEE IS ON CALL TO BE EXTENDED UP TO 9. JUNE, 1979 OR PAYMENT TO BE MADE IN FULL STOP PLEASE EITHER EXTEND YOUR COUNTER GUARANTEE/CREDIT IN OUR FAVOUR ACCORDINGLY OR CREDIT OUR ACCOUNT FOR THE TOTAL AMOUNT WITH YOURSELVES DLRS 1,128,245.

At United's request, Citibank responded to Iranians' that United had fulfilled its contractual obligations and that the performance bond upon which TCI was making its call should have been cancelled. The January 9, 1979 expiration date came and went. Apparently because of the civil disturbances

476

in Iran, Citibank received no tested messages from Iranians' from December 27, 1978 through February 19, 1979. No further word came from Iranians' on letter of credit No. CK–650061 until February 27, 1979 when Citibank received the following telex dated the previous day:

RE YOUR TELEX JAN 5 . . PLEASE NOTE WE CANNOT CANCEL OUR GTEE PRIOR TO BENEFICIARIES APPROVAL AND SINCE THEY HAVE DEMANDED EITHER EXTENSION UNTIL 9. JUNE 1979 OR FULL PAYMENT THEREFORE TO HONOUR OUR UNDERTAKINGS WE CALL GTEE AMOUNT PLEASE CREDIT OUR ACCOUNT WITH YOURSELVES $1,128,245.

United again refused to extend the expiration date notwithstanding Citibank's warning that this cable could be construed as a demand for payment under the letter of credit.

As to letter of credit No. K–312190, scheduled to expire on February 24, 1979, Citibank received a cable from Iranians' in late February which read as follows:

OUR GUARANTEE IS ON CALL TO BE EXTENDED UP TO MAY 24, 1979 OR PAYMENT TO BE MADE IN FULL STOP PLEASE EITHER EXTEND YOUR CREDIT IN OUR FAVOUR ACCORDINGLY OR CREDIT OUR ACCOUNT WITH YOURSELVES DLRS 142,050.

Citibank contends that this cable was received on February 23; United argues that it was received on February 26. United has refused to agree to any further extension of time as to this letter of credit.

On March 14, 1979, Iranians' informed Citibank by telex that Iranians' had given written assurance to TCI of an extension or payment within a reasonable time on the performance bond and that Citibank's "prompt action" would be appreciated.

### Discussion

I. *The Motion to Remand*

■ Citibank has removed this action to this court pursuant to 12 U.S.C. § 632 which states in pertinent part:

Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possession of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States for the proper district by following the procedure for the removal of causes otherwise provided by law.

There is no question that this suit arises out of an international banking transaction. United contends, however, that because of Citibank's right to reimbursement by United for any amounts paid out under the letters of credit, Citibank is in a "no lose" posture and, as such, is not a "defendant" for the purposes of this removal statute. United analogizes to cases in which an American bank is sued in state court as an escrow stakeholder by a party to an escrow agreement, *Bata v. Central-Penn National Bank,* 223 F.Supp. 91 (E.D.Pa.1963), or has brought a state interpleader action against rival claimants to deposits held by the bank, *Chase National Bank v. Directorate General of Postal Remittances & Savings Bank,* 95 F.Supp. 733 (S.D.N.Y.1951). In each of these cases, holding that removal had been improvident, the federal district court remanded the cases to state court. Both federal courts stressed that the bank was essentially a neutral stakeholder, standing indifferent between rival claimants. *Bata, supra,* 223 F.Supp. at 94; *Chase, supra,* 95

F.Supp. at 739. In the instant case, by contrast, Citibank is not the mere holder of a *res* to which it has no contractual right. At issue is Citibank's contractual liability under a letter of credit pursuant to which only Iranians' can claim any right to payment. Nor is Citibank "indifferent" to or "disinterested" in the outcome of the suit. Notwithstanding its contractual right to reimbursement for amounts expended under the letters of credit, Citibank has argued that its reputation as a reliable international banker and its continued right to do business in Iran are at stake. Moreover, it has actively opposed plaintiffs' request for preliminary injunctive relief. The court finds Citibank's interests to be sufficiently weighty and adverse to plaintiffs' to render Citibank a "defendant" for the purposes of removal. Accordingly, United's motion to remand this action to New York Supreme Court is denied.

II. *The Motion for a Preliminary Injunction*

The standard which governs the issuance of preliminary injunctive relief is well established in this circuit. The movant must show:

> possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the preliminary relief.

*Caulfield v. Board of Education,* 583 F.2d 605, 610 (2d Cir. 1978); *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1358 (2d Cir. 1976). On the merits, United raises three distinct theories in support of its claim for injunctive relief which will be discussed *seriatim.*

A. *The Merits*

1. *"Fraud in the Transaction"*

 A letter of credit is a commitment on the part of the issuing bank that it will pay a draft or demand for payment presented to it under the terms of the credit. *United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 392 N.Y.S.2d 265, 270, 360 N.E.2d 943 (1976). There are usually three distinct contracts involved in a letter of credit transaction: the contract of the bank with its customer by which it undertakes to issue the letter of credit; the letter of credit itself; and the underlying contract of sale ordinarily between the buyer who has procured the issuance of the letter and the seller who is given the right to present drafts thereunder. *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 465 (2d Cir. 1970). In this case, unlike the usual pattern, the seller [United] procured the issuance of the letter as a guarantee of its contractual performance. *See Dynamics Corp. of America v. Citizens & Southern National Bank,* 356 F.Supp. 991, 996 (N.D.Ga.1973). Moreover, the beneficiary of the letter here is not a party to the sales contract but a foreign bank [Iranians'] which has issued a performance bond as security to the buyer [TCI] for United's contractual performance.

It is axiomatic that the issuing bank's obligations under its letter of credit is independent of its customer's obligations under the contract of sale. "Banks issuing letters of credit deal in documents and not in goods and are not responsible for any breach of warranty or nonconformity of the goods involved in the underlying sales contract." *United Bank, supra,* 392 N.Y.S.2d at 270, 360 N.E.2d at 948. New York's Uniform Commercial Code, which the parties agree is applicable here, nevertheless provides for certain limited circumstances in which the issuing bank may be enjoined by its customer from honoring a demand for payment. UCC § 5–114(2) states in pertinent part:

> (2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document . . . is forged or fraudulent or there is fraud in the transaction
>
> (a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course (Section 3–302) . . . ; and

478

(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

 Citibank contends that it must honor Iranians' demand for payment pursuant to § 5–114(2)(a) and that this court is powerless to issue an injunction against payment because Iranians' is a "holder in due course." When Iranians' accepted the letter of credit in 1975, Citibank argues, it had no notice of any "fraud in the transaction" or any defense to the underlying contract. UCC § 3–302(1)(c). Under UCC § 3–302(2), a payee on a note may be a holder in due course and, it might be argued, the named beneficiary on a letter of credit should enjoy similar status. UCC § 5–114(2)(a), however, renders the issuing bank's obligation enforceable, and non-enjoinable, only where the holder "of the draft or demand has *taken the draft or demand* under the credit and under circumstances which would make it a holder in due course." This section thus protects one who takes a draft or demand issued pursuant to a letter of credit, rather than the beneficiary of the letter of credit who issues the demand. A letter of credit itself is not a negotiable instrument; thus, Iranians' good faith at the time it accepted the letter would appear irrelevant. At least one commentator has stated that the issuing bank may lawfully refuse honor (and may be enjoined against making payment) if there is "fraud in the transaction" and the party presenting the draft "is the beneficiary or some other party who is not . . . a holder in due course." White & Summers, Uniform Commercial Code, § 18–6 at 624 (1972 ed.).

 The question remains whether the statutory standard of "fraud in the transaction" has been established here. The statute is a codification of the landmark case of *Sztejn v. Schroder Banking Corp.,* 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). In

*Sztejn,* the purchaser under a contract of sale sued to enjoin a bank from honoring drafts under a letter of credit issued to secure the purchase price. The complaint alleged that the seller delivered fifty crates of cowhair and rubbish in place of the bristles called for in the contract. Although the court acknowledged the general principle that the issuer's obligation under its letter of credit is independent of the primary contract of sale, it held that the issuer may be restrained from honoring a demand when it has received notice of the seller's "active fraud." 31 N.Y.S.2d at 634. The *Sztejn* case has been recently cited with approval by the New York Court of Appeals which stated that the framers of § 5–114(2) "eschewed a dogmatic approach and adopted a flexible standard to be applied as the circumstances of a particular situation mandate." *United Bank, supra,* 392 N.Y.S.2d at 271, 360 N.E.2d at 949. The Court of Appeals acknowledged, however, that "[i]t can be difficult to draw a precise line between cases involving breach of warranty (or a difference of opinion as to the quality of goods) and outright fraudulent practice on the part of the seller." *Id.* This court must conclude that on the limited record before it, United has failed to show that fraud—rather than a mere dispute as to performance—is involved.

United contends that it has fully performed its contracts and has not been informed by TCI of any claim for breach. Of course, TCI is not before the court at this time and the court cannot judge the bona fides of any claim TCI may have on the contracts. The contracts do not contain any deadline by which TCI must determine whether a shipment of tendered cable is non-conforming nor do they limit the time within which TCI must make a claim under its performance bond with Iranians' in the event of United's breach. Even after the date upon which United claims that it made the last delivery of cable called for under the contracts, United agreed to extend the terms of both letters of credit until January 9, 1979 and February 24, 1979 respectively. Although it is not apparent from the record

why United acceded to the requests for extensions, it may be inferred that United was, at least, put on notice of the possibility of a claim by TCI under the performance bond with Iranians'. The limited facts available to the court on this record are more indicative of a dispute as to performance than of an outright fraud.

### 2. Political Turmoil

United next contends that payment under the letters of credit should be enjoined on the ground that political unrest in Iran may account for TCI's demand for payment on Iranians' performance bond when the underlying contract has been fully performed. As a matter of substantive law, United argues, New York will suspend the usual obligation of an issuing bank to honor demands for payment on a letter of credit where international political developments hinder economic performance.

There is undoubtedly support in the case law for this proposition.[1] Thus, in *Nadler v. Mei Loong Corp. of China,* 177 Misc. 263, 30 N.Y.S.2d 323 (Sup.Ct.1941), purchasers of fur who had procured the issuance of letters of credit in favor of the New York agent of the Chinese seller brought suit to enjoin the issuing bank from honoring drafts and bills of lading that had been presented to it. The plaintiffs alleged that the fur had not yet arrived and, due to the disruption of Chinese shipping and the American and Japanese embargoes in effect at the time, the bills of lading had been either fraudulent in their inception or that the furs had subsequently been removed from the ships. The New York Supreme Court granted the injunction stating:

> In normal times bills of lading and drafts of the kind in suit cannot be questioned and must be honored; but these are extraordinary times in which ordinary business standards and strict legal rules must be specially examined and perhaps disregarded in the interest of justice and

equity. . . . Consider the effect of denying plaintiffs' motion. The trust company could then honor the drafts; the moneys would leave this jurisdiction and the plaintiffs would have neither furs nor money. In any subsequent litigation plaintiffs might bring against the trust company, the latter might well argue that its conduct in paying was approved by the court's denial of this motion. On the other hand, the money is here; the contracts were all made here; the respective rights of all the parties should be determined here, and the plaintiffs should not have to go to China for their furs or their moneys.

30 N.Y.S.2d at 324.

A scant three weeks before *Nadler* was decided, the same court presented with the virtually identical claim denied the requested injunctive relief. In *Grob v. Manufacturers Trust Co.,* 177 Misc. 45, 29 N.Y.S.2d 916 (Sup.Ct.1941), the purchaser of egg yolk powder from a Chinese seller sought to enjoin the bank which had issued letters of credit in the seller's behalf from accepting drafts drawn under the letters. The court acknowledged that the plaintiff's apprehension that the Japanese ships which were likely to issue the bills of lading would fail to bring the powder to the United States was well founded. Nevertheless, the Court denied the motion for injunctive relief.

> It is quite plain, . . . that under plaintiff's contracts the sellers have performed and are entitled to their pay when bills of lading are obtained, and that defendant is required to accept the drafts when bills of lading are presented, and that it is the plaintiff who took the risk of actual delivery of the goods. That is the plain meaning and necessary effect of authorizing the sellers to draw drafts accompanied by bills of lading instead of delaying payment until actual delivery, and it also is the plain meaning of authorizing defendant to accept drafts accompanied by bills of lading instead of delay-

1. Article 5 of the UCC "deals with some but *not all of the rules and concepts of letters of* credit." UCC § 5 102(3). Precode case law continues to govern where Article 5 is not controlling. *United Bank, supra,* 392 N.Y.S.2d at 270 n.2, 360 N.E.2d 947 n.2.

ing acceptance until actual arrival of the merchandise. Granting the requested injunction would be nothing other than shifting to the sellers or to the defendant risks which plaintiff has contracted to assume, or, in other words, authorizing plaintiff to breach his contracts and compelling defendant to breach its contracts. 29 N.Y.S.2d at 916.

■ These cases reflect two irreconcilable approaches to the same problem—the allocation of risk among the parties to a letter of credit transaction when the uncertainties of events abroad disrupt normal commercial enterprise. The *Erie* doctrine requires this court to apply New York law to this controversy whether "declared by its Legislature in a statute or by its highest court." *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Neither party has cited a New York Court of Appeals decision confronting the problem and the court's own research has not revealed one. The court must, nevertheless, "apply . . . state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, [this court] may be said to be, in effect, sitting as a state court." *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967); *see United States v. Novsam Realty Corp.,* 125 F.2d 456, 457 (2d Cir. 1942).

■ After due consideration, this court must conclude that the *Grob* case represents the sounder approach in this case. Unlike *Nadler,* the underlying contracts of sale were not made in the United States, but in Iran. A party, like United, which undertakes to do business abroad subjects itself to many risks, political upheavals in foreign states among them. United, a huge multinational corporation with worldwide operations and net assets of nearly $3 billion, may well have had the bargaining power to shift that risk to the purchaser or to the beneficiary of the letters of credit by contracting for a "force majeure" clause, or the like, in the letters of credit. As written, however, Citibank's obligation to honor a timely demand for payment is unqualified.

The court is disinclined to write into the letter of credit an excusing condition which the parties themselves did not adopt.

### 3. Untimeliness of the Demand

■ United's final theory on the merits is that the demands made by Iranians' for payment pursuant to the letters of credit, were untimely. Strict compliance with the terms of a letter of credit must generally be established to create liability on the part of the issuing bank, *Venizelos, S.A., supra,* 425 F.2d at 465; *Dynamics Corp., supra,* 356 F.Supp. at 995; *Sztejn, supra,* 31 N.Y.S.2d at 634, and an untimely demand under the terms of the letter excuses the bank's obligation to honor it. *See Banco Tornquist v. American Bank & Trust Co.,* 71 Misc.2d 874, 337 N.Y.S.2d 489 (1972).

■ The cable sent by Iranians' to Citibank on December 23, 1978 was somewhat equivocal: Citibank was given the option to pay or to extend the expiration date of letter No. CK–650061. It was not until February 27, 1979—some seven weeks after the expiration of that letter of credit—that Iranians' demanded payment in an unconditional manner. Citibank does not contend that the December 23, 1978 cable should be construed to be a substantive request for payment, but that Iranians' was permitted a commercially reasonable period of time past the expiration date of the letter of credit in which to determine that its performance bond in favor of TCI remained outstanding. In light of the civil unrest in Iran during the weeks in question and Iranians' resultant inability to transmit any telexes to Citibank at that time, Citibank argues that this seven week hiatus was not a commercially unreasonable delay.

Citibank, however, points to no provision of the letter of credit agreement which expressly permits Iranians' to wait *any* period of time beyond the specified expiration date in order to notify Citibank. Nor has Citibank shown that the course of dealing between these parties or the usage of the trade is to permit the beneficiary in Iranians' position to delay a reasonable period of time before certifying that the conditions

permitting it to draw upon the letter of credit exist. The court must thus conclude that United has shown sufficiently serious questions going to the merits of the issue of timeliness to make it a fair ground for litigation.

◆

### B. Balance of Equities and Possible Irreparable Harm

█ In light of Citibank's right of reimbursement from United for amounts disbursed under the letters of credit, this court has little trouble concluding that the equities tip decidedly in United's favor. Citibank's fears that the failure to honor Iranians' demands will subject it to possible recriminations in Iran are wholly speculative. The chance that an Iranian court might fail to recognize this court's injunction against payment and thereby subject Citibank to liability without the right to reimbursement from United is also conjectural.

A prime requisite for the issuance of preliminary injunctive relief, however, is the existence of possible irreparable harm. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). An adequate remedy at law exists for United's claim of untimely demand. Although Article 5 of the Uniform Commercial Code does not expressly state a measure of damages for "wrongful honor," damages are nonetheless recoverable against the issuing bank when it honors a demand that fails to conform to the terms of the letter of credit. *Interco, Inc. v. First National Bank of Boston*, 560 F.2d 480, 484–86 (1st Cir. 1977). United's motion for a preliminary injunction must, therefore, be denied.

### Conclusion

United's motions to remand this action to New York Supreme Court and for a preliminary injunction restraining Citibank from paying on the letters of credit are denied.

So Ordered.