CAPPAERT ENTERPRISES, a
Mississippi Partnership

v.

CITIZENS AND SOUTHERN
INTERNATIONAL BANK
OF NEW ORLEANS.

Civ. A. No. 78–3635.

United States District Court,
E. D. Louisiana.

March 28, 1980.

Peter J. Butler, New Orleans, La., Lee Davis Thames, Ramsey, Bodron, Thames & Robinson, Vicksburg, Miss., for plaintiff.

Kenneth E. Moore, New Orleans, La., Warren M. Schultz, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant.

JACK M. GORDON, J., District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves an international letter of credit between Cappaert Enterprises ("Cappaert"), as the customer; Citizens and Southern International Bank of New Orleans ("C & S Bank"), as the issuing bank; and the Bank of Kuwait and the Middle East ("BKME") as the beneficiary. Based upon Cappaert's unrebutted representation that fraud occurred in the transaction this Court entered a temporary restraining order and subsequently granted a preliminary injunction predicated upon Cappaert's demonstration that there existed a substantial likelihood that it would eventually prevail on the merits. The success of Cappaert in discharging its burden at the preliminary injunction stage of this proceeding notwithstanding, the Court now holds that Cappaert has failed to produce legally sufficient evidence in support of its claims that there was fraud in the transaction thereby entitling it to the relief sought; that it will suffer irreparable injury unless the injunc-

tion issues; that the threatened injury to it outweighs whatever damage the proposed injunction may cause C & S Bank; and that the injunction, if issued, would not be adverse to the public interest. *Louisiana Consumers' League, Inc. v. Louisiana State Board of Optometry Examiners,* 557 F.2d 473, 474 (5th Cir. 1977), and *Hardin v. Houston Chronicle Publishing Company,* 572 F.2d 1106, 1107 (5th Cir. 1978).

## FINDINGS OF FACT

1.

Cappaert a Mississippi partnership, entered into a joint venture operation with United Fisheries of Kuwait, K.S.C. ("United Fisheries" ), a Kuwaiti corporation, under the name Unicap Barge Lines ("Unicap").

2.

The joint venture agreement,[1] which was signed and dated on March 31, 1976, provides, inter alia:

1. CAPPAERT and UNITED agree to create a joint venture to acquire barges and tug boats to engage and operate a barge transportation business within the areas of the Arabian Gulf and Red Sea.

2. The Parties will enter into a contract with Morillon Corval or its subsidiaries of Paris, France to acquire a total of 41 barges, such barges to be renovated, repaired and repainted and delivered to the joint venture in Rouen, France. The joint venture shall pay to Morillon Corval the sum of $1,388,700 for said 41 barges.

3. The joint venture will charter the M/V BORAG for transportation of the 41 barges from Rouen, France to Kuwait for the total consideration of $1,325,000.

4. UNITED will provide six (6) trawlers to be used as tugboats for the joint venture and CAPPAERT and UNITED agree to pay for the modification costs necessary to convert such trawlers. Such modification costs of the six (6) trawlers are estimated to be $345,600. The joint venture agrees to pay to UNITED the sum of $15,000 cash each per month for rental of the trawler tugs during the period of the joint venture.

---

1. Plaintiff's exhibit No. 1.

5.   CAPPAERT agrees to organize and manage the operations and business of the joint venture and UNITED agrees to provide the necessary licenses, permits, authorities and approvals for the joint venture to operate within the areas described hereinabove.

6.   CAPPAERT and UNITED agree to arrange the necessary financing for the operation of the joint venture. It is anticipated that the joint venture will borrow $3,300,000 upon the best terms available and it is anticipated that the joint venturers will advance the sum of $500,-000 cash and the balance of $2,800,000 shall be financed over a period of three (3) years with the barges being acquired used as security for such borrowings. If any personal guarantees are required of the joint venture partners then such guarantees shall be given in the proportion of 51% to UNITED and 49% to CAPPAERT. In like manner any cash advances made as required of the joint venture partners shall be in the proportion 51% to UNITED and 49% to CAPPAERT.

\*      \*      \*      \*      \*      \*

12.   The parties agree to make arrangements for financing the purchase of the barges, the renovation of the trawlers and other incidentals required to commence the operation of the joint venture. Should additional cash monies be required by the parties or should additional guarantees be required by the Lenders, then such cash contributions and such guarantees shall be upon the basis of 51% to UNITED and 49% to CAPPAERT.

3.

According to a letter agreement dated April 25, 1976,[2] United agreed to remove its fishing fleet from eight pier sides which it occupied in the Port of Kuwait and make them available for the operations of UNICAP. Cappaert assumed the responsibility of providing management and expertise in the operations of the joint venture.

4.

Unicap eventually borrowed funds from BKME, which is a Kuwaiti bank doing business within the State of Kuwait. The only evidence regarding the consummation of this loan was the testimony of Mr. Delbert Hosemann, General Counsel for Cappaert. Hosemann testified that he did not participate in the arrangement of the loan; furthermore, he had no contact with BKME prior to the Spring of 1978, when the loan was renewed. Neither the loan agreement nor any other document reflecting the terms of the loan was introduced into evidence.

5.

Pursuant to sections 6 and 12 of the joint venture agreement, supra, Cappaert was required to provide a partial guarantee for the loan obtained by Unicap from BKME. The guarantee established by Cappaert was in the form of an irrevocable letter of credit. Application was made by Cappaert to the C & S Bank on May 4, 1977. According to the terms of the application, BKME was named as the beneficiary and the aggregate amount of the credit was not to exceed $1,200,000.00. The credit was payable upon presentation by BKME of its sight draft drawn on C & S Bank. Cappaert's instruction on the application was for C & S Bank to:

Pay against the certification in duplicate from the Bank of Kuwait and The Middle East that Unicap Barge Lines has defaulted under the terms of the Loan Agreement of the 6th day of February, 1977 between Unicap Barge Lines, Payee and the Bank of Kuwait and the Middle East, Lender, and United Fisheries of Kuwait, K.S.C. and Cappaert Enterprises, guarantors.[3]

6.

On May 18, 1977, C & S Bank established its irrevocable letter of credit No. 8436 in

2.   Plaintiff's exhibit No. 1–A, signed by F. L. Cappaert, representing Cappaert, and Abdullatif A. Asfour, representing United.

3.   Plaintiff's exhibit No. 2.

favor of BKME.[4] Without affecting the relevant provisions thereof, the letter of credit was first amended on June 27, 1977. The letter of credit was last amended on April 21, 1978, to conform with the renegotiation of the loan earlier that month.[5] The full text of the letter of credit, as amended, is as follows:

> We hereby amend our L/C 8436, such amendment superseding all previous instructions under our L/C 8436 as follows:
>
> In consideration of your granting a loan of KD 500,000 to Unicap Barge Lines, a joint venture of the United Fisheries of Kuwait KSC and Cappaert Enterprises, a Mississippi partnership USA, we, the Citizens and Southern International Bank of New Orleans hereby establish our irrevocable letter of credit no. 8436 in your favor for US$879,665.00 only. The letter of credit is payable against your certification in duplicate that Unicap Barge Lines has defaulted under the terms of the loan agreement dated 6th February 1977, signed between Unicap Barge Lines and United Fisheries and Cappaert Enterprises and Bank of Kuwait and the Middle East, Kuwait. The balance of the loan shall be paid in nine quarterly installments (beginning April 25, 1978) and should any of the nine installments become due and not paid by Unicap Barge Lines, then you may draw upon this letter of credit up to the sum of US$100,-000.00 only for each of eight defaulted installments and US$79,665.00 only for the ninth defaulted installment. Interest is not included or covered under this letter of credit. The amount of this letter of credit shall be reduced by the amount of US$100,000.00 as each installment is paid throught [sic] the eighth installment which corresponding to letter of credit value will be US$79,665.00 only.
>
> This letter of credit expires two years from April 25, 1978, i. e., 25th April, 1980, at the counters of the Citizens and Southern International Bank of New Orleans. (Underscoring added.)

The renegotiation of the loan between Unicap and BKME was precipitated by the fact that KD 87,550 on the original loan was unsecured by United Fisheries and Cappaert. By letter dated March 29, 1978, BKME informed Unicap that the securities provided by United Fisheries valued at KD 634,000, and the letter of credit from C & S Bank in the amount of US$779,665, which is the equivalent of KD 215,187, left unsecured KD 42,550 in principal and KD 45,000 in interest on the loan after the repayment of the fourth installment.

7.

At the time of the April 21, 1978, amendment to letter of credit no. 8436, there remained nine installments outstanding with respect to the repayment of the loan. The first installment was due on April 25, 1978, and the remaining eight installments were due quarterly thereafter. On October 25, 1978, C & S Bank received a Telex from BKME advising of a default by Unicap on the loan installment due on that date.[6] C & S Bank responded by acknowledging receipt of the Telex and further advising BKME that it stood ready to pay under the credit upon proper presentation of the certification required by the terms of the letter of credit.[7] The requisite certification was received by C & S Bank from BKME on November 3, 1978.[8]

---

4. Plaintiff's exhibit No. 4.

5. Although Mr. Hosemann testified as to the renegotiation of the loan, his participation in those negotiations was very limited.

6. Defendant's exhibit No. 12.

7. Defendant's exhibit No. 13.

8. The text of the certification received by C & S Bank from BKME was:

> Further to our cable on 25th October, 1978, we hereby certify that Unicap Barge Lines have defaulted under the terms of the above mentioned Loan Agreement dated 6th February, 1977, signed between Unicap Barge Lines, United Fisheries of Kuwait, Cappaert Enterprises and The Bank of Kuwait and The Middle East, KSC, Kuwait.
>
> We, therefore in terms of your Credit no. 8436 call upon you to remit the sum of US $100,000.00 representing 49% of Unicap's share in respect of the 6th unpaid instalment, (sic) to our account with the Hongkong and

### 8.

Complying with the temporary restraining order entered by this Court on November 6, 1978, C & S Bank advised BKME that it was under court order not to honor BKME's demand for payment.[9] BKME responded:

Cannot accept your refusal payment of claim under your credit 8436 stop Court order concerns between yourselves and your customers whereas under terms your credit you are directly liable to honour documents under same refer article three A(9) and eight C of Uniform Customs 1974 revision stop We demand immediate payment telex by return that amount now remitted our account Hongkong New York.[10]

### 9.

C & S Bank has received additional demands for payment from BKME in connection with letter of credit no. 8436. These demands relate to the installments due on January 25, 1979; April 25, 1979; July 25, 1979; October 25, 1979; January 25, 1980; and an additional installment will become due on April 25, 1980. C & S Bank has not honored any of BKME's demands for payment and has advised BKME that it is under court order not to do so.

### 10.

Cappaert contends that United Fisheries has breached the joint venture agreement in the following respects:

(a) Legal title to the barges, the primary assets of the joint venture, is in the name of United Fisheries. After the business relationship between Cappaert and United Fisheries was established, Cappaert attempted to gain title in the name of the joint venture or in the names of the joint venturers. As reflected in a Telex from Mr. Hosemann to Abdullatif Asfour, however, under Kuwaiti law it is mandated that title to property must be in the name of a Kuwaiti corporation.[11]

(b) United Fisheries failed to abide by its obligation to secure the licenses, permit, authorities and approvals necessary for operation in Kuwait.

(c) In furtherance of its activities unrelated to the joint venture, United Fisheries violated various regulations of the Port Authority in Kuwait, and these violations resulted in damage and injury to the joint venture.

(d) As a result of a conflict of interest, United Fisheries refused to collect a claim on behalf of the joint venturers for approximately $166,000 in demurrage.

In regard to the claim for demurrage, there is absolutely no documentary support for the fact that such a claim exists. Assuming, arguendo, that the joint venture does have a viable claim for demurrage, Cappaert, as the managing party to the

---

Shanghai Banking Corp., New York as claimed by our cable dated 25th October, 1978. (Defendant's exhibit No. 14.)

9. Defendant's exhibit No. 15.

10. The final paragraph of the May 18, 1977, letter from C & S Bank to BKME establishing letter of credit no. 8436 provided:

This credit is subject to the Uniform Customs and Practice for Documentary Credits (1974 revision) International Chamber of Commerce Publication No. 290.

Article 3(A)(i) provides:

An irrevocable credit constitutes a definite undertaking of the issuing bank, provided that the terms and conditions of the credit are complied with: (i) to pay, or that payment will be made, if the credit provides for payment, whether against a draft or not.

Article 8(c) provides:

If, upon receipt of the documents, the issuing bank considers that they appear on their face not to be in accordance with the terms and conditions of the credit, that bank must determine, on the basis of the documents alone, whether to claim the payment, acceptance or negotiation was not affected in accordance with the terms and conditions of the credit.

11. Plaintiff's exhibit No. 19, a Telex dated January 6, 1977, from Mr. Hosemann to Mr. Asfour, provides:

Have checked with Bank attorneys and problem Cappaert has with financing any part of barges using mortgage of barges is that legal title must be vested in United Fisheries to operate, use and own barges in Kuwait.

joint venture, has not produced facts to support the contention that United Fisheries is responsible for the collection of the claim. With respect to Cappaert's allegations under (b) and (c), supra, the Court finds Cappaert has failed to establish that United Fisheries abandoned the joint venture and destroyed its business. A review of the evidence indicates that the Port Authority of Kuwait did interfere with Unicap's operations;[12] however, there is no evidentiary support for Cappaert's theory that United Fisheries deliberately provoked the Port Authority in order to undermine the joint venture or to defraud Cappaert.

### 11.

Cappaert further contends that as each installment came due under the loan agreement, United Fisheries would make the payment for Unicap. United Fisheries would then receive reimbursement from Cappaert of its share. This was allegedly accomplished by having BKME certify to C & S Bank that Unicap had defaulted. When C & S Bank made payment under the letter of credit, BKME would deposit the funds to the account of United Fisheries.

Because this theory was unrebutted at the hearing on the preliminary injunction, the Court concluded that Cappaert demonstrated a substantial likelihood of success on the merits. After the trial on the permanent injunction, however, the record contains no evidence substantiating this skeletal theory. Mr. Hosemann, Cappaert's only witness to testify on this point, has not been in the State of Kuwait since September, 1978. The first default on a loan installment by Unicap, which prompted BKME to make demand on the letter of credit, occurred on October, 1978. Mr. Hosemann has no firsthand knowledge regarding any transactions or events, including the payment or nonpayment of loan installments, that have occurred in Kuwait since September, 1978.

Two letters which purport to be from Faisal M. Al-Shatti, Assistant Financial Manager of United Fisheries, to Cappaert suggest a measure of credulity in Capp-

aert's theory of how payment was made under the letter of credit. Both letters are similar in content and brevity. Plaintiff's exhibit No. 8 provides:

> Our books show that a sum of KD 7291.-112 is to be settled by you direct with us in respect of the installment due on 25th October, 1977 met by us with Bank of Kuwait and The Middle East, Kuwait. You will recall the understanding that the loan will be settled, both principal and interest, by the partners according to the share of each partner.

> Statement enclosed is up to 31st December, 1977, and we look forward to forwarding us a cheque in full settlement of the sum as early as possible.

Plaintiff's exhibit No. 9 provides:

> We are enclosing a statement showing the position of your share of Unicap loan with BKME as of 31st January, 1978. Remittance under C & S International Bank Guarantee No. 8436 in respect of instalment met by us on 25th January, 1978 is still awaited, and we shall be crediting you in statement with the sum as soon as it is receive by BKME. A further statement will be rendered to you then.

These two documents notwithstanding, certain facts preclude the Court from drawing the inferences necessary to support a permanent injunction. First, both letters relate to installments that came due prior to the October, 1978, installment upon which Unicap defaulted according to BKME's certification to C & S Bank. Assuming, arguendo, that payment of the October, 1978, installment, as well as subsequent installments, were handled in the manner suggested by plaintiff's exhibits Nos. 8 and 9, then it is clear that Cappaert was fully aware of this method of payment. In addition, plaintiff's exhibit No. 8 relates to an installment due on October 25, 1977, and plaintiff's exhibit No. 9 relates to an installment due on January 20, 1978, both of which predated Cappaert's two-year extension of the letter of credit on April 21,

---

12. Of particular relevance on this point are plaintiff's exhibits Nos. 13–15.

1978.[13] The Court finds it difficult to accept that Cappaert believed it was being defrauded by this method of payment yet nevertheless agreed to extent the life of the letter of credit two years. Furthermore, neither plaintiff's exhibit No. 8 nor plaintiff's exhibit No. 9 indicate that Unicap had not actually defaulted on the loan. Whether or not United Fisheries made full payment after a default by Unicap is irrelevant to C & S Bank, whose obligation as the issuing bank was contingent upon receipt of a certification of default from BKME.

## 12.

Cappaert failed to demonstrate that it has no legal recourse against United Fisheries under Kuwaite law and Kuwaiti judicial process. Only Mr. Hosemann testified as to this issue. Despite the fact that Mr. Hosemann is an attorney-at-law, he is not qualified to express an opinion on the rights, remedies and judicial process available to Cappaert in the State of Kuwait. According to his own testimony, he has never received any training in Kuwaiti law, and he has never practiced law in the State of Kuwait.

## 13.

C & S Bank, a corporation organized and existing under the Edge Act, 12 U.S.C. §§ 601, et seq., is engaged in the business of international banking. In connection with its activities, it periodically has assets located within the State of Kuwait. Moreover, BKME occasionally acts as a collecting agent within the State of Kuwait for C & S Bank and in that capacity actually holds assets belonging to C & S Bank.

## 14.

BKME is neither a party to this litigation nor is it bound by any orders of this Court. Further, BKME's Telex of November 8, 1978,[14] indicates that BKME may well attempt to enforce its rights to payment under the letter of credit against C & S Bank if payment from C & S Bank is not forthcoming. These steps may include a banker's setoff of any funds held by it and

belonging to C & S Bank, as well as seizure of C & S Bank's assets located within the State of Kuwait. Should BKME take action against C & S Bank, C & S Bank would be required to litigate its claims against BKME in the State of Kuwait.

## CONCLUSIONS OF LAW

This Court has subject matter jurisdiction over this action by virtue of diversity of citizenship and an amount in controversy, exclusive of interest and costs, in excess of $10,000.00. 28 U.S.C. § 1332.

Disposition of this suit in equity against Cappaert and in favor of C & S Bank is premised upon the Court's conclusion that Cappaert has not satisfied the statutory requirements of the Uniform Commercial Code nor the traditional equitable prerequisites for injunctive relief.

## STATUTORY REQUIREMENTS

The statutory authority pursuant to which Cappaert has sought injunctive relief is La.R.S. 10:5–114(2)(b) (Supp.1979), which provides:

> (2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title or of security or is forged or fraudulent or there is fraud in the transaction.

> \* \* \* \* \* \*

> (b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the document but a court of appropriate jurisdiction may enjoin such honor.

Cappaert has theorized that fraud has occurred in the transaction based upon the alleged activities of United Fisheries and the conduct of BKME as a collection agent for United Fisheries. The bulk of the evi-

13. Compare plaintiff's exhibits Nos. 4 and 7.

14. See text at fn. 10, supra.

dence introduced at the trial of this matter was devoted to the issue of fraud on behalf of United Fisheries.

■ The accuracy of Cappaert's allegation that United Fisheries acted fraudulently in its role as a joint venturer is immaterial to the resolution of this issue, for impropriety in the underlying agreement is irrelevant to an interpretation of the letter of credit. In *Pringle-Associated Mortgage Corporation v. Southern National Bank of Hattiesburg, Mississippi*, 571 F.2d 871, 874 (5th Cir. 1978), the Court of Appeals for the Fifth Circuit held:

> The essence of a letter of credit is the promise by a bank, or other issuer, to pay money. The key to the uniqueness of a letter of credit and to its commercial vitality is that the promise by the issuer is independent of any underlying contracts. See *Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1238–39 (5th Cir. 1973), cert. dismissed, 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir. 1970). As the Third Circuit has said, "[t]he beneficiary bases his claim on the letter of credit . . .—not on the agreement between the customer and the issuing bank, nor upon the underlying arrangement between customer and beneficiary." *Chase Manhattan Bank v. Equibank*, 550 F.2d 882, 886 (3d Cir. 1977). Thus, a court should not resort to those underlying agreements in interpreting a letter of credit. See *Dulien Steel Products Incorporated of Washington v. Bankers Trust Company*, 298 F.2d 836, 841 (2d Cir. 1962).

The Court of Appeals for the Fifth Circuit recently reaffirmed the established rule that the issuing bank's obligation under a letter of credit is independent of the underlying contracts.

> Regardless of which form of letter of credit is used, upon compliance with the conditions contained in the letter, the recipient is entitled to full payment. This entitlement is independent of collateral obligations which may exist under the other underlying contracts. [citations

omitted] Thus, even if the producer of the letter has a valid defense on his contract with the recipient of the letter, the bank cannot assert it. [citation omitted] *East Girard Savings Association v. Citizens National Bank and Trust Company of Baytown*, 593 F.2d 598, 602 (5th Cir. 1979).

■ It is axiomatic that C & S Bank's obligation under its letter of credit is independent of, and therefore not affected by, the veracity of Cappaert's allegations of fraud by United Fisheries in the underlying joint venture.

In analyzing Cappaert's claim of "fraud in the transaction," the Court enjoys the benefit of a spate of jurisprudence on this point generated by the recent turmoil in Iran. The issue before the court in *United Technologies Corp. v. Citibank, N.A.*, 469 F.Supp. 473 (S.D.N.Y.1979), was the interpretation of Sections 5–114 of the Uniform Commercial Code. In that case United agreed to sell $20 million worth of telephone cable to Telecommunications Company of Iran ("T.C.I."). The contract of sale required United, as seller, to procure from Iranians' Bank performance bonds in an amount approximately equal to 10% of the contract price. The contracts also provided for proportionate reductions of the amounts due under the performance bonds within two months of the delivery of each shipment of telephone cable. As an inducement to Iranians' Bank to issue the performance bonds, United procured the issuance by Citibank of two irrevocable letters of credit in favor of Iranians' Bank.

The evidence before the court indicated that the contracts of sale had been fully performed on both sides by August of 1978. The expiration of both letters of credit had been extended until January and February, 1979, respectively. Because of civil disturbances in Iran, Citibank received no tested messages from Iranians' Bank from December 27, 1978, until February 19, 1979, at which time the letter of credit with the February expiration date was called on by Iranians' Bank.

In response to whether the statutory standard of "fraud in the transaction" had been established, the court noted that the issuer may be restrained from honoring a demand when it has received notice of the seller's "active fraud," but nevertheless concluded that, based on the facts before it, United failed to show that fraud—rather than a mere dispute as to performance—was involved.

United also argued that payment under the letter of credit should be enjoined on the ground that "political unrest in Iran may account for T.C.I.'s demand for payment on Iranians' performance bond when the underlying contract has been fully performed." Rejecting this contention the court held:

A party, like United, which undertakes to do business abroad subjects itself to many risks, political upheavals in foreign states among them. . . . As written, however, Citibank's obligation to honor a timely demand for payment is unqualified. The Court is disinclined to write into the letter of credit an excusing condition which the parties themselves did not adopt. (469 F.Supp. 480)

Although the set of facts upon which *United Technologies Corp.* was decided is more extreme than the scenario described by Cappaert, there are, however, some meaningful parallels. Cappaert's characterization of United Fisheries as a disloyal corrupt partner who took every home field advantage against Cappaert would not justify enjoining payment under the letter of credit even if it were supported by the evidence. This is one of the risks undertaken by those who conduct business abroad.[15] One of the reasons irrevocable letters of credit have so greatly facilitated international trade is because payment is made to the beneficiary by the issuer regardless of the materialization of business risks such as those alleged by Cappaert.

A similar situation was presented in *KMW International v. Chase Manhattan Bank, N.A.*, 606 F.2d 10 (2d Cir. 1979). KMW accepted a purchase order for telephone poles from the Khuzestan Water and Power Authority. In order to procure the contract, KMW was required to obtain a performance guarantee through an Iranian bank for 10% of the total value of the purchase order, or approximately $350,000. Accordingly, KMW arranged to have Chase Manhattan Bank issue an irrevocable letter of credit for the benefit of the Khuzestan Water & Power Authority in favor of an Iranian Bank. Chase issued an irrevocable letter of credit in favor of Banque Etebarate of Tehran, providing for payment to Banque Etebarate upon receipt by Chase of

[Banque Etebarate's] authenticated cable certifying [that] the amount drawn is the amount you have called upon to pay Khuzestan Water and Power Authority, P. O. Box 13, Ahwaz, Iran, under your guarantee issued at the request of KMW International due to nonperformance by KMW International under the terms of Khuzestan Water & Power Authority purchase order # 4229 date August 1, 1978.

KMW was to receive payment for the telephone poles by means of a separate letter of credit that would be established by the Khuzestan Water & Power Authority through a prime American bank in favor of KMW. KMW's obligation to deliver was deferred until after it had received the letter of credit in its favor.

Confirmation of the letter of credit in KMW's favor was never received because of

---

15. In *American Bell International, Inc. v. Islamic Republic of Iran*, 474 F.Supp. 420 (S.D.N.Y., 1979), the court held:

One who reaps the rewards of commercial arrangements must also accept their burdens. One such burden in this case, voluntarily accepted by Bell, was the risk that demand might be made without cause on the funds constituting the down payment. To be sure, the sequence of events that led up to that demand may well have been unforeseeable when the contracts were signed. To this extent, both Bell and Manufacturers have been made the unwitting and innocent victims of tumultuous events beyond their control. But, as between the innocents, the party who undertakes by contract the risk of political uncertainty and governmental caprice must bear the consequences when the risk comes home to roost.

a postal strike. Due to the strike, which was one of many avatars of the chaos preceding the fall of the Imperial Government of Iran, the Khuzestan Authority had not received confirmation of the performance guarantee issued by Banque Etebarate.

Based upon these events the District Court enjoined payment by Chase Manhattan Bank of the letter of credit reasoning that, "a state of insurrection had occurred which created" a suspension, if not a termination, of the status "of the Water and Power Authority." Soon thereafter, Chase Manhattan Bank received a cable from Banque Etebarate in response to its notification of suspension pointing out that the Banque could not accept suspension of the letter of credit, because it was irrevocable and subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 290 (1974 Revision) (The UCP), and that Banque Etebarate was under obligation to pay to the Water and Power Authority the amount of its guarantee due to the suspension of the counter-indemnity.[16]

The Court of Appeals for the Second Circuit reversed the action of the District Court holding that a loss that may be adequately redressed by a monetary award is not recognized as irreparable harm. The Court also concluded that it would be inequitable to shift the risk of loss from KMW, the customer, to Chase Manhattan Bank, the issuer:

Furthermore, when KMW entered into its contract with the Water and Power Authority it assumed the business risks of international transactions. These risks included the possibility that even if a dispute about performance of the underlying contract should arise and international litigation ensue, . . . KMW's funds would be paid out under the irrevocable letter of credit and held in foreign hands. A preliminary injunction shifts the burden to Chase to pursue that international litigation. Such a shifting of

risk is unwarranted where, as here, one party to an international business transaction has previously subjected itself to the risks and hazards of foreign political turmoil. (citations omitted) 606 F.2d p. 15.

In footnote 2 the court noted that the injunction would impose hardships on Chase due to the fact that it and its affiliates conduct business in Iran and other foreign countries. Inasmuch as an irrevocable letter of credit is an unconditional obligation to pay upon proper demand, the court observed that injunction would hinder Chase's ability to honor commitments it must meet in the international banking community. Consistent with universally accepted principles, the court recognized that:

As a matter of law, a bank's obligation under a letter of credit is totally independent of the underlying transaction. (606 F.2d p. 15)

In this light it is clear that Cappaert's allegations of misconduct on the part of United Fisheries is immaterial.

As in *KMW v. Chase Manhattan Bank*, C & S Bank is subject to the Uniform Customs and Practices for Documentary Credits, International Chamber of Commerce, Publication No. 290 (1974 Revision), by the terms of the Telex confirming. establishment of the letter of credit. UCP General Provisions and Definitions Paragraph (c) and Article 8(a) provide:

c. Credits, by their nature, are separate transactions from the sales or other contracts on which they may be based and banks are in no way concerned with or bound by such contracts.

8(a) In documentary credit operations all parties concerned deal in documents and not in goods.

Based upon this authority the court in *KMW* concluded:

There is nothing in the U.C.C. or the UCP which excuses an issuing bank from paying a letter of credit because of superven-

---

**16.** A similar reference to the UCP was contained in the BKME's response to C & S Bank's Telex concerning the issuance of the preliminary injunction in the present case. See text at fn. 10, supra.

ing illegality, impossibility, war or insurrection. Indeed, Article 8(c) of the U.C.P. provides the opposite, viz., that a bank suspecting noncongruence with terms and conditions of credit "must determine, on the basis of the documents alone, whether to claim that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit." (p. 15)

The only documents upon which C & S Bank could make this determination was the certification in duplicate that Unicap had defaulted. According to C & S Bank the certification was in proper form.[17]

Insofar as the UCP does not deal with the question of fraud, the Uniform Commercial Code is operative here. After argument on the preliminary injunction, the court concluded that Cappaert, whose factual allegations were virtually unopposed, had satisfied the threshold requirement for a preliminary injunction by demonstrating a substantial likelihood that the beneficiary was taking unconscious advantage of the situation and was intending to run off with plaintiff's money on a pro forma declaration which had absolutely no basis in fact.[18] In view of the facts developed at the trial on the permanent injunction, however, the Court concludes that Cappaert's allegations do not withstand analysis.

■ Throughout the entire course of events, Cappaert representatives met with representatives of BKME on only one occasion and that was for the purpose of increasing the collateral held by BKME from $779,665 to $879,665, and extending the expiration date from April 24, 1978, to April 25, 1980. At the time of this meeting the evidence indicates that Cappaert was cognizant of the following facts: The legal obstacles encountered by United Fisheries in attempting to give Cappaert legal title; United Fisheries had failed to make eight pier sides available for use by the joint venture; United Fisheries had at one time failed to remove "junk" from the piers, although it was subsequently removed; the Port Authority, essentially a competitor of Unicap, interpreted the rules and regulations hypertechnically in Unicap's case; and the practice established by BKME in handling the loan installments on which Unicap defaulted. In addition to its awareness of these facts, it is equally clear that Cappaert did not know any of the details of the loan agreement with BKME. Despite the foregoing, Cappaert nevertheless voluntarily agreed to increase its collateral with BKME and extend the expiration date on the letter of credit. Furthermore, Cappaert has not produced any evidence indicating a change in the status quo between the date of its meeting with BKME representatives and the initiation of this action. The Court is constrained to conclude that Cappaert has not laid a factual foundation to support its theory of fraud in the transaction.[19]

## TRADITIONAL EQUITABLE PREREQUISITES

■ In addition to its failure to satisfy the statutory prerequisite for injunctive relief, the Court concludes that Cappaert has fallen short of demonstrating irreparable harm and inadequacy of legal remedies.[20]

17. In *Pan American World Airways, Inc. v. Bank Melli Iran and Citibank, N.A.*, Slip Opinion No. 79 Civ. 1190 (S.D.N.Y.1979), the court stated:

The general rule is that if the documents required to be presented to the issuing bank are in good form, the issuer's customer has no right to interfere with the honoring of the letters of credit.

18. See, *Dynamics Corporation of America v. Citizens and Southern National Bank*, 356 F.Supp. 991 (N.D.Ga.1973).

19. Under Louisiana law, fraud can never be presumed, and proof of fraud must be clear and convincing and must be more than a mere preponderance of the evidence. *Allied Oil Workers Union v. Ethyl Corp.*, 208 F.Supp. 615 (E.D.La.1962), aff'd. 325 F.2d 1017 (5th Cir. 1964); *Midland-Guardian of Pensacola, Inc. v. Carr*, 288 F.Supp. 499, 502 (E.D.La.1968); *Marcello v. Bussiere*, 284 So.2d 892 (La.1973).

20. According to *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57, 95 S.Ct. 2067, 2075, 45 L.Ed.2d 12 (1975), the grant of injunctive relief

■ Section 5–114 of the Uniform Commercial Code, codified in Louisiana as La. R.S. 10:5–114, has been adopted in jurisdictions other than Louisiana in essentially the same form. The uniform interpretation of this section holds that irreparable harm and inadequacy of legal remedies must be established prior to the issuance of an injunction. In *United Technologies Corp. v. Citibank, N.A.*, supra, at 481, the court held that the existence of possible irreparable harm was "a prime requisite" for the issuance of injunctive relief. In *American Bell International, Inc. v. Manufacturers Hanover Trust Co.*, No. 3157/79 (S.Ct.N.Y., March 26, 1979), aff'd, 418 N.Y.S.2d 551 (App.Div. 1979), the court held that the party seeking injunctive relief had the burden of proving irreparable harm. Concluding that the injury asserted by the plaintiffs was only speculative, and that it was uncertain and speculative as to whether the plaintiffs would have an adequate remedy at law, the court denied the requested injunction. Finding that the plaintiff had an adequate remedy at law against Bank Melli, the court in *Pan American World Airways, Inc. v. Bank Melli Iran*, supra, denied injunctive relief against the defendant bank. In *American Bell International, Inc. v. Islamic Republic of Iran*, supra, the court denied the requested injunction on the basis of the plaintiff's failure to prove irreparable injury. In *KMW International v. Chase Manhattan Bank, N.A.*, supra, the Court of Appeals for the Second Circuit held that proof of irreparable injury was a prerequisite to injunctive relief. Concluding that the plaintiff failed to discharge its burden in this regard, the court vacated the preliminary injunction entered by the District Court.

Based upon a provision of the Louisiana Code of Civil Procedure, Cappaert argues that under the law of Louisiana it is relieved of the burden of establishing the traditional prerequisites to injunctive relief. Pretermitting the question of whether or not this is an appropriate matter for consideration by a federal court sitting in diversity,[21] the Court finds that Cappaert's proposed construction of the standards by which the Court is to evaluate a request of equitable relief under La.R.S. 10:5–114 is without support in Louisiana law. Cappaert contends that a statutory grant of injunctive power eliminates the need to prove irreparable harm or inadequacy of legal remedy. La.R.S. 18:381 (1950) (Acts 1940, No. 46, § 101), the state primary election laws, contained a provision that conferred jurisdiction upon the courts to enter injunctions in connection with disputes regarding primary elections. In *Perez v. Edwards*, 336 So.2d 1072 (La.App. 1st Cir. 1976), the plaintiff sought to enjoin a primary election. Finding that "no irreparable harm will occur if the election is allowed to proceed  .  .  ." the court denied the requested relief.[22]

■ Having examined Louisiana law on the subject, the Court concludes that no authority therein dictates deviation from the uniform interpretation of Section 5–114 of the Uniform Commercial Code.

■ Another fact upon which the Court concludes that the permanent injunction should be denied is that the potential harm Cappaert may incur is $679,000.00. This potential injury is compensable in money damages; therefore, Cappaert will not suffer irreparable harm.[23]

is a remedy whose basis in the federal courts has always been irreparable harm and inadequacy of legal remedies. See also *Interco, Inc. v. First National Bank of Boston*, 560 F.2d 480 (1st Cir. 1977).

21. Resolution of this issue is governed by the pronouncement of the United States Supreme Court in *Byrd v. Blue Ridge Rural Electric Cooperative*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

22. See also *Fuori V. Fuori*, 334 So.2d 488, 492–493 (La.App. 1st Cir. 1976).

23. In *Continental Oil Co. v. Crutcher*, 465 F.Supp. 118, 120 (E.D.La.1979), the court held that the extraordinary remedy of injunctive relief was not warranted because the plaintiff's claim was compensable in money damages.

Furthermore, Cappaert has not demonstrated that it has an inadequate remedy at law. The attempts to enjoin payment under international letters of credit spawned by the overthrow of the Imperial Government in Iran met with failure because the plaintiffs failed to establish, among other elements, an inadequate remedy at law. At worst, Cappaert's access to the courts of Kuwait may be characterized as conjectural or speculative; however, in *KMW International* and *American Bell International*, supra, such a showing was held to be unsatisfactory. Therefore, Cappaert has not established entitlement to permanent injunctive relief.

Having assessed the equities involved, the Court concludes that the potential injury to C & S Bank tips the equitable balance decidedly against Cappaert. Although it is unsettled whether the threat of recriminations in a foreign country is a valid factor to consider,[24] the reputation and credibility of C & S Bank as an issuer is relevant. C & S Bank's inability to perform under the irrevocable cable letter of credit could seriously impugn its commercial honor. Moreover, a decision enjoining its performance could easily have a concentric effect throughout American foreign commerce. As Mr. Henry Harfield, an oft-cited authority in the field, stated in an amici curiae brief filed in the *American Bell International* litigation, supra:

> To grant an injunction in these case, where no fraud has or can be shown in the letter of credit transactions, would have a serious adverse effect upon American foreign commerce. Foreign beneficiaries of American bank credits might well speculate that, in a misguided effort to protect American businesses trading abroad, American courts are willing to carve out of the issuer's obligation to pay additional an unpredictable exceptions. American bank credits will lose their wide acceptability if the assured payment represented by American bank credits is

eroded by extraneous qualification of the issuer's commitment to pay. As a result, American banks and their customers will be placed at a competitive disadvantage to their foreign counterparts in international trade. (Brief on Behalf of Amici Curiae at 12–13, *American Bell International, Inc. v. Manufacturers Hanover Trust Co.*, No. 5773N (N.Y.Sup.Ct., App. Div., 1st Dept., June 28, 1979) N.Y.L.J. at 6, Col. 1, aff'g. No. 3157/79 (N.Y.Sup.Ct., March 26, 1979)).

This analysis of the big picture is applicable to the instant case. Concluding that the equities tip decidedly in favor of C & S Bank, the Court denied Cappaert's request for a permanent injunction.

IT IS ORDERED that a judgment will be entered in favor of defendant, Citizens and Southern International Bank of New Orleans, and against plaintiff, Cappaert Enterprises, (i) denying plaintiff's application for a permanent injunction; (ii) dissolving the preliminary injunction entered in this action on November 16, 1978; and (iii) dismissing plaintiff's claims with cost.

---

**24.** The court in *United Technologies Corp.*, supra, found this factor to be "speculative" and "conjectural" and therefore did not attribute any weight to it. However, in *KMW International* and *American Bell International*, supra, the court did consider this factor.