**ENTERPRISE INTERNATIONAL, INC.,**
**Plaintiff-Appellee,**

v.

**CORPORACION ESTATAL PETROL-**
**ERA ECUATORIANA, et al.,**
**Defendants-Appellants.**

No. 84–2424.

United States Court of Appeals,
Fifth Circuit.

June 10, 1985.

Rehearing Denied July 8, 1985.

Porter & Clements, Joanne M. Vorpahl, Jesse R. Pierce, Houston, Tex., for Corporacion.

Fulbright & Jaworski, J. Todd Shields, Ronald D. Secrest, Houston, Tex., for Bank of America, N.T. & S.A.

Hutcheson & Grundy, Darrel E. Reed, Jr., Kenneth R. Breitbeil, Houston, Tex., for Enterprise.

Vinson & Elkins, D. Bobbit Noel, Jr., Houston, Tex., for First City Nat. Bank of Houston, N.A.

Before GOLDBERG, RUBIN, and HILL, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Without deciding whether it had personal jurisdiction over Ecuador's official state-operated oil company, which interposed a challenge to the court's jurisdiction, the district court issued a preliminary injunction prohibiting the Ecuadorian oil company from demanding payment on a letter of guarantee issued by the Ecuadorian branch office of a bank whose main office is in the United States, prohibiting the Ecuadorian branch office from demanding payment on a letter of credit issued by a different bank located in the United States, and prohibiting the United States bank from honoring any such demand on the letter of credit. Because the court acted judicially without making any finding on its challenged jurisdiction over the Ecuadorian oil company, and because, as to the parties who did not challenge the court's jurisdiction, the irreparable injury requisite to the issuance of a preliminary injunction was not shown, we vacate the injunction and remand for further proceedings.

## I.

Corporacion Estatal Petrolera Ecuatoriana ("C.E.P.E."), the official state-operated oil company of the Republic of Ecuador, agreed to buy liquid petroleum gas (LPG) from Belen Enterprise International, Inc. ("Belen-Enterprise"), a Panamanian corporation. Belen-Enterprise obtained a letter of guarantee from Bank of America in Quito, Ecuador, and one of its parent corporations, Enterprise International, Inc. ("Enterprise International"), obtained a supporting letter of credit from First City Na-

tional Bank of Houston, Texas, to guarantee performance of the contract. Belen-Enterprise is ultimately jointly owned by Belen Co., Ltd. ("Belen"), another Panamanian corporation, and Enterprise International, a Texas corporation. Enterprise International filed this suit to enjoin Bank of America, First City National Bank, and C.E.P.E. from honoring, drawing upon, or drawing down the letter of credit and the letter of guarantee issued to guarantee Belen-Enterprise's performance of the LPG contract.

The contract requires the following. The seller is to deliver stated quantities of LPG monthly from April, 1983, through March, 1984, and to establish an unconditional irrevocable guarantee for its performance in the amount of $1,700,000 with Bank of America in Quito, Ecuador, in favor of C.E.P.E.[1] The guarantee is to remain in force through "60 days after [the] contract's expiration date or the signing of an Act of Settlement."[2] If the seller fails to fulfill the contract, the buyer must give the seller fifteen days notice to justify or correct the matter, and if the problem is not corrected in this time, the buyer "may make the guarantee effective" by advising the bank of the matter.[3]

Pursuant to a provision for the settlement of contractual disputes, set forth in full in the footnote,[4] all claims of the buyer must be submitted to a designated Ecuadorian court, and the laws of Ecuador are to be applied to the "legal effects" of the contract. The parties are to sign an act of settlement within thirty days of the termination of the contract, and the buyer must return the "performance bond" to the seller seven working days after signing the act of settlement.[5]

In accordance with the contract, Belen-Enterprise secured a letter of guarantee ("the guarantee") for $1,750,000 from the Bank of America in Quito for the benefit of C.E.P.E. To support the guarantee of Bank of America, Enterprise International

1. Enterprise International offered into evidence at the district court hearing an English translation of the LPG contract, which contains the following section:
NINETEENTH—GUARANTEE
19.01 Previous to subscription of this contract and to insure its performance, Seller shall present an irrevocable, unconditional Bank guarantee of immediate payment for the amount of one million seven hundred thousand dollars (US $1,700,000.00) given by the Bank of America of Quito. This guarantee will remain in force through the standing period of 60 days after contract's expiration date or the signing of an Act of Settlement.
19.02 In the case of non fulfilment of this contract on the Seller's side the Buyer will notify him giving the Seller fifteen (15) working days to justify it or correct it if [sic] within this period the Seller does not answer the Buyer will make effective the guarantee by sending a notification to the Bank advising them of this matter.
19.03 Buyer may also apply partially, the guarantee to collect values such as interest delays, price difference, demurrage, etc ..., which Seller may have not paid or reimbursed within a reasonable term. In such case the guarantee has to be renewed to its original value within fifteen (15) days. If the guarantee is not replaced to its original value within this period, Buyer will make it effective for the balance. In all cases, in which the buyer makes the guarantee effective in the full amount, this contract will be considered as terminated with no further claims from Seller.

2. See id.

3. See id.

4. EIGHTEENTH—COMPETENCE AND PROCEDURE
18.01 Any claim that may arise in relation with the interpretation of this contract shall be settled by mutual agreement within fifteen (15) days of the beginning of the problem. If no agreement is reached, all claims made by the Buyer shall be submitted to the judges of the Provincia de Pichincha through verbal summary procedure.
Seller expressly resigns jurisdiction and domicile and is subjected to the judges mentioned in this clause.
18.02 For all legal effects of this contract the parties are submitted to the laws of the Republic of Ecuador.

5. The pertinent clause in Enterprise International's English translation of the contract states:
17.02 At the termination of this contract and prior to the liquidation of all obligations hereunder and [sic] Act of Settlement shall be signed in a term of (30) days. Buyer will return the correspondent performance bond to the Seller seven working days after signing this Act of Settlement.

obtained a standby letter of credit ("the standby letter") for the same amount in the form of a telex from First City National in Houston. The telex, which lists Bank of America, Quito, as the beneficiary of the standby letter, and Enterprise International as the applicant, by its own terms, "is the operative document." It instructs Bank of America to issue its "irrevocable and unconditional bank guarantee on behalf of [Belen-Enterprise] in favor of [C.E.P.E.] expiring June 2, 1984, in Ecuador supporting LPG" and authorizes Bank of America to issue its guarantee in its "usual text in Spanish version and according to your local regulations." The telex states that, should Bank of America be required to honor its guarantee, after notice to First City National, Bank of America is to debit First City National's account at Bank of America in San Francisco. According to testimony given at the preliminary injunction hearing, First City National would then debit the account of Enterprise International in Houston.

Bank of America in Quito issued its letter of guarantee in accordance with First City National's instructions. The letter informs C.E.P.E. that First City National establishes itself as the guarantor of Belen-Enterprise for "up to the sum of US $1,750,000.00" to guarantee the performance of the LPG contract and that First City National will pay the amount of the guarantee upon C.E.P.E.'s presentation to Bank of America in Quito of the signed contract between C.E.P.E. and Belen-Enterprise, an official letter signed by the General Manager of C.E.P.E. stating that Belen-Enterprise has failed to comply with its contractual obligations, and the original guarantee. The guarantee also states that First City National "indicate[s] as [its] domicile (business address) for all purposes for this guarantee, and, especially for its payment, (the offices of) Bank of America" in Quito, Ecuador, and that it authorizes

Bank of America "to effect the payment of this guarantee on our behalf and under our responsibility, when it is requested, in accordance with the terms of this document (guarantee)."

Belen-Enterprise delivered LPG from April, 1983, through March, 1984, without any notice from C.E.P.E. that it was dissatisfied with Belen-Enterprise's performance. During April, the President of Belen-Enterprise thrice submitted to C.E.P.E. a documentation of the fees accumulated during the course of the LPG contract for which C.E.P.E. was allegedly responsible, so that an act of settlement might be negotiated and signed within thirty days of termination of the contract, as required by the contract.[6] Although the parties began to negotiate in June, 1984, they have not yet signed an act of settlement.

On May 22, C.E.P.E. requested that the date of the guarantee be extended for two more months because the act of settlement had not been signed, and it claimed that, according to the LPG contract, the guarantee was to continue until that was done. Belen-Enterprise refused to extend the guarantee, stating that it had received a telex from C.E.P.E. to the effect that the LPG contract terminated on March 31, 1984,[7] and there had been more than sufficient time for the two companies to negotiate and sign an act of settlement. Bank of America then informed First City National that C.E.P.E. had threatened to draw down the guarantee if it was not extended.

Fearing that the guarantee and the standby letter would be drawn upon, Enterprise International filed this suit in Texas state court seeking a temporary restraining order prohibiting C.E.P.E. from drawing on, and prohibiting Bank of America and First City National from honoring, the guarantee or the standby letter should C.E.P.E. make a demand. The state court granted the temporary restraining order on June 1, 1984, and Enterprise International,

**6.** *See id.*

**7.** The March 27, 1984, telex from C.E.P.E. to Belen-Enterprise reads:

Re our LPG contract we inform you that since it finalices [*sic*] Mar. 31/84, last cargoe [*sic*] corresponding to said contract will be made on gas vessel "GAS MARINER."

in accordance with the state court's order, extended the standby letter until June 11.

C.E.P.E. removed the case to the federal district court, and, on June 11, the district court granted its own temporary restraining order. After C.E.P.E. made requests for further extensions and threats to draw upon the guarantee, Enterprise International agreed to extend the guarantee to June 21, the day on which the district court held the hearing on the motion for a preliminary injunction. The morning of that hearing, Bank of America again notified First City National that C.E.P.E. would demand payment if another extension were not granted.

The district court granted a preliminary injunction prohibiting C.E.P.E. from drawing on the guarantee or the standby letter and prohibiting Bank of America and First City National from honoring any demand by C.E.P.E. The court found that there was a substantial likelihood that Enterprise International would succeed on the merits of its claim that the LPG contract and its obligation to provide the letter of credit had terminated. Although there was evidence that C.E.P.E. had claimed in June, 1984, that Enterprise International owed it approximately $500,000,[8] the court found that C.E.P.E. had made no "formal claims" prior to the filing of the original petition, and that Enterprise International's claims against C.E.P.E. were "in excess of $200,-000." According to the court's interpretation of the LPG contract, C.E.P.E.'s failure to notify Enterprise International of any breach of the contract contravened the notice-of-breach provision of the contract.[9] The court also implicitly held that the LPG contract expired on March 31, 1984, and it resolved a contractual ambiguity in favor of Enterprise International by holding that the obligation to maintain the credit expired sixty days after the termination date of the contract, *i.e.*, March 31, 1984, and not sixty days after the signing of an act of settlement, as C.E.P.E. had argued.[10] Thus, the court held that "the contract ... should have been completed and [Enterprise International] released from a requirement to fund a letter of credit. Instead, ... C.E.P.E. has held [Enterprise International] hostage by threatening on several occasions to draw against the letter of credit unless the terms were amended extending its termination date."

The district court also held that there was a substantial likelihood that Enterprise International would succeed on its claim that C.E.P.E.'s actions constituted "fraud in the transaction," which would entitle Enterprise International to permanently enjoin Bank of America and First City National from honoring the credit and the guarantee. It found that C.E.P.E. "was using the letter of credit and letter of guarantee as a vehicle for fraud and that this wrongful conduct represents 'fraud in the transaction.'"

Finding that Enterprise International would suffer the immediate loss of $1,750,-000, as well as damage to its "reputation and good will in the international market place since [payment on the standby letter] will give the inaccurate appearance that Enterprise [International] has failed to perform as promised," the court held that Enterprise International would suffer irreparable injury in the absence of the preliminary injunction. It also found "that Enterprise [International] will encounter significant resistance to a recovery of judgment against the Ecuadorian national oil company," and, thus, that Ecuador was not an impartial forum.

In a footnote, the court considered and rejected C.E.P.E.'s claim that the appropriate forum for the case is Ecuador. It stated that the pertinent clause of the LPG contract[11] required that the claims of C.E.P.E., the buyer, be submitted to the courts of Ecuador, but not that the claims of

---

**8.** C.E.P.E. now claims that it is owed $269,-192.01.

**9.** *See supra* note 1 (clause 19.02).

**10.** The ambiguity is found in clause 19.01 of the LPG contract. *See supra* note 1.

**11.** *See supra* note 4.

Enterprise International, "the seller," be so submitted. The court also stated, however, that the issue of the appropriate forum would "be resolved [*sic*] pending trial on the merits."

The harm to the defendants from the issuance of an injunction, according to the court, did not outweigh the potential injury to Enterprise International if its request for the injunction were denied. The court premised its conclusion, however, upon the assumption that no harm to the defendants would result from the injunction "if the status quo is maintained pending trial on the merits." Nevertheless, even though the standby letter was due to expire on the day of the hearing, the court, rather than requiring Enterprise International to extend the credit pending trial on the merits, required it to post only a $1000 bond. The court also found that the public interest would not be disserved by the issuance of the preliminary injunction.

Finally, in a footnote, the district court noted that it would defer judgment on C.E.P.E.'s motion to dismiss for lack of subject matter and in personam jurisdiction pending discovery by Enterprise International. In ruling on the motion to dismiss, the court reiterated its deferral of judgment on the jurisdictional issues pending further discovery and rejected C.E.P.E.'s claim that prior litigation collaterally estopped Enterprise International from prevailing on the jurisdictional issues.

On appeal, C.E.P.E. contends that the district court had no jurisdiction over it under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, that the court erred in granting a preliminary injunction without first making a finding concerning its jurisdiction over C.E.P.E. under the Act, and that Enterprise International had not established its entitlement to a preliminary injunction. It also asserts that prior litiga-

tion collaterally estops Enterprise International from prevailing on the issue of jurisdiction. Bank of America contends that the district court abused its discretion in granting the preliminary injunction. Both C.E.P.E. and Bank of America claim that the district court erred in failing to maintain the status quo and ask for relief from the effects of this alleged failure.

## II.

The district court's issuance of the preliminary injunction is the primary issue before us on appeal, and we follow the usual judicial practice in reviewing injunctions of not "delv[ing] any further into the merits of the controversy than is necessary to decide the specific issues being appealed." [12] We first consider C.E.P.E.'s contention that the district court erred in granting the preliminary injunction while deferring making any findings on the court's subject matter and personal jurisdiction over C.E.P.E. under the Foreign Sovereign Immunities Act.

Fed.R.Civ.P. 65 "determines only the method of seeking and obtaining any sort of an injunction, and has no bearing on either the jurisdiction to exercise, or the propriety of exercising, the injunctive power." [13] Because Rule 65 confers no jurisdiction, the district court must have both subject matter jurisdiction and "in personam jurisdiction over the party against whom the injunction runs," and, when that party is the defendant, this "implies either voluntary appearance by him or effective service of process." [14] The "district court has no power to grant an interlocutory or final injunction against a party over whom it has not acquired valid jurisdiction," and an order granting an interlocutory injunction in these circumstances "is erroneous as a matter of law." [15] As we stated long

12. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2962, at 629–30 (1973).

13. 7 J. Moore, J. Lucas & K. Sinclair, Jr., *Moore's Federal Practice* ¶ 65.03[2], at 65–25 (1985) (footnotes omitted).

14. *Id.* ¶ 65.03[3], at 65–31 to 65–32 (footnotes omitted); *see also Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56, 59 (2d Cir.1981).

15. 7 J. Moore, J. Lucas & K. Sinclair, Jr., *supra* note 13, at 65–33 (citing *Eighth Regional War*

ago in reviewing the injunctive power of the district court: "[T]he question of jurisdiction is always vital. A court must have jurisdiction as a prerequisite to the exercise of discretion. The question whether a court abused its discretion necessarily involves the question whether a court has any discretion to abuse." [16]

The Second Circuit faced a similar problem in *Visual Sciences, Inc. v. Integrated Communications, Inc.*[17] That court noted that ordinarily a plaintiff need only make a prima facie showing of jurisdiction in response to a motion to dismiss, in the absence of a "full-blown hearing on the merits." [18] Before a trial court may validly enter a preliminary injunction, however, more is required: "Where a challenge to jurisdiction is interposed on an application for a preliminary injunction '[t]he plaintiff is required to adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.' " [19] In *Union Carbide Corp. v. UGI Corp.*,[20] we recognized the principle applied in *Visual Sciences* but found that the district court had, "prior to issuing the preliminary injunction, held an adequate hearing and determined that it had in personam jurisdiction over [the party enjoined]." [21]

Unlike the district court in *Union Carbide*, which ruled on the jurisdictional issue, or even the district court in *Visual Sciences*, which made some findings of fact, albeit inadequate, on the jurisdictional issue, the district court in this case postponed any consideration of the issue of personal jurisdiction over C.E.P.E. pending further discovery and made no findings whatever on C.E.P.E.'s claim that there had been insufficient service of process.

■ As we said in *Eighth Regional War Labor Board v. Humble Oil & Refining Co.*[22] of a preliminary injunction enjoining a party "to whatever extent th[e] court may have jurisdiction over" it, "[w]e know of no power in the court, without determining its own challenged jurisdiction, to issue its caveat 'to whatever extent' jurisdiction may exist." [23]

We hold, therefore, that the district court should not have issued the preliminary injunction against C.E.P.E. without determining whether it had jurisdiction over the party enjoined.

### III.

■ Bank of America did not contest the district court's jurisdiction over it. It argues, as C.E.P.E. does in the alternative, that Enterprise International did not make a sufficient showing to entitle it to a preliminary injunction and that the district court, therefore, abused its discretion by issuing the injunction.

In order to secure a preliminary injunction, the movant has the burden of proving four elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and (4) that the injunction will not disserve the public interest." [24]

Labor Bd. v. Humble Oil & Ref. Co., 145 F.2d 462 (5th Cir.1944), *cert. denied,* 325 U.S. 883, 65 S.Ct. 1577, 89 L.Ed. 1998 (1945).

**16.** *Eighth Regional War Labor Bd. v. Humble Oil & Ref. Co.*, 145 F.2d 462, 464 (5th Cir.1944), *cert. denied,* 325 U.S. 883, 65 S.Ct. 1577, 89 L.Ed. 1998 (1945); *see also Land-O-Nod Co. v. Bassett Furniture Indus., Inc.,* 708 F.2d 1338, 1340 (8th Cir.1983).

**17.** 660 F.2d 56 (2d Cir.1981).

**18.** *Id.* at 58.

**19.** *Id.* at 59 (citing *Industrial Elec. Corp. v. Cline,* 330 F.2d 480, 482 (3d Cir.1964) ).

**20.** 731 F.2d 1186 (5th Cir.1984).

**21.** *Id.* at 1189 n. 4.

**22.** 145 F.2d 462 (5th Cir.1944), *cert. denied,* 325 U.S. 883, 65 S.Ct. 1577, 89 L.Ed. 1998 (1945).

**23.** *Id.* at 464.

**24.** *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984); *see also Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.,* 600 F.2d 1184, 1187 (5th Cir.1979); *Clements Wire & Mfg. Co. v. NLRB,* 589 F.2d 894, 897 (5th Cir.1979).

The district court's decision to grant or deny a preliminary injunction lies within its discretion, "and may be reversed on appeal only by a showing of abuse of discretion."[25] The appellate court is not simply to substitute its judgment for the trial court's, else that court's announced discretion would be meaningless. This discretion, however, is not unbridled,[26] and a preliminary injunction "must be the product of reasoned application of the four factors held to be necessary prerequisites."[27]

■ In reviewing the findings of fact and conclusions of law required to be made when the district judge grants or denies a preliminary injunction,[28] we must uphold its findings of fact unless they are clearly erroneous.[29] As explained by the Third Circuit:

This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district judge; only a clear abuse of his discretion will justify appellate reversal.[30] "The court's conclusions of law, however, 'are subject to broad review and will be reversed if incorrect.'"[31]

■ In considering whether to grant or deny preliminary injunctive relief, the district court "must remember that a preliminary injunction is an extraordinary and drastic remedy,"[32] and that "[t]he movant has a heavy burden of persuading the district court that all four elements are satisfied."[33] Thus, if the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue and, if issued, will be vacated on appeal.[34] When the movant fails to prove that, absent the injunction, irreparable injury will result, therefore, the preliminary injunction should be denied.[35]

■ Federal courts have long recognized that, when "the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction."[36] In short, "[t]he key word ... is *irreparable*,"[37] and an "injury is 'irreparable' only if it cannot be undone through monetary remedies."[38] Thus, "[t]he possi-

---

25. *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984); *see also Meyers v. Moody,* 723 F.2d 388, 389 (5th Cir.1984); *City of Meridian, Mississippi v. Algernon Blair, Inc.,* 721 F.2d 525, 527 (5th Cir.1983).

26. *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974); *see also Clements Wire & Mfg. Co. v. NLRB,* 589 F.2d 894, 897 (5th Cir. 1979).

27. *Florida Medical Ass'n v. H.E.W.,* 601 F.2d 199, 202 (5th Cir.1979).

28. *See* Fed.R.Civ.P. 52(a).

29. *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984); *see* Fed.R.Civ.P. 52(a).

30. *United States Steel Corp. v. Fraternal Ass'n of Steelhaulers,* 431 F.2d 1046, 1048 (3d Cir.1970), *quoted in* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2962, at 636 (1973).

31. *Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984) (quoting *Common-*

wealth Life Ins. Co. v. Neal,* 669 F.2d 300, 304 (5th Cir.1982) ).

32. *Canal Authority v. Callaway,* 489 F.2d 567, 573 (5th Cir.1974).

33. *Hardin v. Houston Chronicle Publishing Co.,* 572 F.2d 1106, 1107 (5th Cir.1978) (citing *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir. 1974) ).

34. *See, e.g., Clements Wire & Mfg. Co. v. NLRB,* 589 F.2d 894, 897 (5th Cir.1979).

35. *Canal Authority v. Callaway,* 489 F.2d 567, 574 (5th Cir.1974).

36. *Id.* at 575.

37. *Morgan v. Fletcher,* 518 F.2d 236, 240 (5th Cir.1975) (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958) ) (emphasis in original).

38. *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981); *see also*

bility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[ ]s heavily against a claim of irreparable harm." [39] The absence of an available remedy by which the movant can later recover monetary damages, however, may also be sufficient to show irreparable injury.[40]

Federal courts have consistently applied these principles to the issuance of preliminary injunctions in cases involving international letters of credit, and, consonant with them, have refused to enjoin the honoring of international letters of credit when, absent such injunctive relief, the movants would have suffered only monetary loss, for which adequate remedies at law were available.[41]

Most of the preliminary injunctions that have been issued in such cases were justified on the basis of the inadequacy of legal remedies in Iranian courts after that country's revolution in 1979 and the taking of the United States citizens as hostages. Thus, in *Itek Corp. v. First National Bank*,[42] *Rockwell International Systems, Inc. v. Citibank, N.A.*,[43] and *Harris Corp. v. National Iranian Radio & Television*,[44] for example, the First, Second, and Elev-enth Circuits found that any resort to Iranian courts to recover the movant's monetary loss, should the preliminary injunction be denied, would be futile and that the existence of the Iran-United States Claims Tribunal did not "ameliorate the likelihood of irreparable injury." [45]

In settings other than the Iranian crisis, however, when it has been shown that foreign courts provide a legal remedy [46] or, at worst, that access to foreign courts is speculative,[47] injunctive relief has been refused. Even in some cases related to and arising after the Iranian revolution, however, federal courts have refused to grant preliminary injunctive relief, finding that "[t]he 'unsettled situation in Iran' [was] simply insufficient to release any party from obligations under the letter of credit," [48] that, even if resort to the Iranian courts was futile, an adequate remedy at law was available in federal court under the Foreign Sovereign Immunities Act,[49] and that the political turmoil in Iran did not permit a federal court "to write into the letter of credit an excusing condition which the parties themselves did not adopt." [50]

This reluctance to grant preliminary injunctive relief in international letter of credit cases is well founded in policy and

---

*Interox America v. PPG Indus., Inc.,* 736 F.2d 194, 202 (5th Cir.1984).

**39.** *Morgan v. Fletcher,* 518 F.2d 236, 240 (5th Cir.1975) (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958) ).

**40.** *See, e.g., Ohio Oil Co. v. Conway,* 279 U.S. 813, 815, 49 S.Ct. 256, 257, 73 L.Ed. 972, 973 (1929); *see also Placid Oil Co. v. United States Dept. of Interior,* 491 F.Supp. 895, 906 (N.D.Tex. 1980).

**41.** *See, e.g., Itek Corp. v. First Nat'l Bank,* 730 F.2d 19, 22–23 (1st Cir.1984); *Rockwell Int'l Sys., Inc. v. Citibank, N.A.,* 719 F.2d 583, 586–88 (2d Cir.1983); *Sperry Int'l Trade, Inc. v. Israel,* 670 F.2d 8, 12 (2d Cir.1982); *Harris Corp. v. National Iranian Radio & Television,* 691 F.2d 1344, 1356–57 (11th Cir.1982); *KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 14–15 (2d Cir.1979); *American Bell Int'l, Inc. v. Islamic Republic of Iran,* 474 F.Supp. 420, 422–23 (S.D. N.Y.1979); *United Technologies Corp. v. Citibank, N.A.,* 469 F.Supp. 473, 481 (S.D.N.Y.1979);

*cf. Interco, Inc. v. First Nat'l Bank,* 560 F.2d 480, 484–86 (1st Cir.1977).

**42.** 730 F.2d 19, 22–23 (1st Cir.1984).

**43.** 719 F.2d 583, 586–88 (2d Cir.1983).

**44.** 691 F.2d 1344, 1356–57 (11th Cir.1982).

**45.** *Rockwell,* 719 F.2d at 587; *see also Itek,* 730 F.2d at 22–23; *Harris,* 691 F.2d at 1356–57.

**46.** *See, e.g., Sperry Int'l Trade, Inc. v. Israel,* 670 F.2d 8, 12–13 (2d Cir.1982).

**47.** *See, e.g., Cappaert Enterprises v. Citizens & Southern Int'l Bank,* 486 F.Supp. 819, 830 (E.D. La.1980) (permanent injunction case).

**48.** *KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 16 (2d Cir.1979).

**49.** *American Bell Int'l, Inc. v. Islamic Republic of Iran,* 474 F.Supp. 420, 423 (S.D.N.Y.1979).

**50.** *United Technologies Corp. v. Citibank, N.A.,* 469 F.Supp. 473, 480 (S.D.N.Y.1979).

business practice as well as in equity. The obligations created by a letter of credit are "completely separate from the underlying transaction, with absolutely no consequence given the underlying transaction unless the credit expressly incorporates its terms." [51] This principle of independence provides the letter of credit with one of its "peculiar values," assurance of payment,[52] and makes it "a unique device developed to meet the specific demands of the market place." [53] Indeed, the "financial value of the letter of credit promise is predicated upon its degree of legal certainty." [54]

■ These features of letters of credit are of particular importance in international transactions, in which sophisticated investors knowingly undertake such risks as political upheaval or contractual breach in return for the benefits to be reaped from international trade.[55] As the First Circuit noted in *Itek Corp.:*

> The very object of a letter of credit is to provide a near foolproof method of placing money in its beneficiary's hands when he complies with the terms contained in the letter itself.... Parties to a contract may use a letter of credit in order to make certain that contractual disputes wend their way towards resolution with money in the beneficiary's pocket rather than in the pocket of the contracting party.[56]

Thus, in this context, the requirements for preliminary injunctive relief, including the showing of a substantial threat of irrepara-ble injury if the injunction is not issued, are to be strictly exacted so as to avoid shifting the contractual allocation both of the risk of loss and the burden of pursuing international litigation.[57]

■ These equitable principles and policy considerations require us to conclude that the district court abused its discretion by granting the preliminary injunction in this case.[58] While we agree with its finding that Enterprise International will suffer the *immediate* loss of a large sum of money if C.E.P.E. draws upon the guarantee letter and Bank of America in turn debits First City National, the very purpose of the guarantee letter was to place the money in the beneficiary's hands while "contractual disputes wend their way towards resolution." [59] Such monetary loss alone, therefore, does not constitute irreparable harm sufficient to justify the issuance of a preliminary injunction.[60]

The district court's finding that Enterprise International's reputation and good will in the international marketplace would be injured from the appearance that it failed to perform as promised is, at best, speculative and is without evidentiary support. No witness, expert or otherwise, offered testimony on the effect that C.E.P. E.'s demand would have on Enterprise International's good will and reputation in the international marketplace. Moreover, we are reluctant to accept the district court's inference that payment on a letter of credit will embroider a permanent "scar-

51. *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 235 (5th Cir.1983); *see also East Girard Sav. Ass'n v. Citizens Nat'l Bank & Trust Co.,* 593 F.2d 598, 602 (5th Cir.1979).

52. *See Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 236 (5th Cir.1983).

53. *East Girard Sav. Ass'n v. Citizens Nat'l Bank & Trust Co.,* 593 F.2d 598, 603 (5th Cir.1979).

54. *KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 16 (2d Cir.1979) (quoting B. Kozolchyk, *Commercial Letters of Credit in the Americas* § 18.04[1], at 394–95 (1966) ).

55. *See, e.g., Cappaert Enterprises v. Citizens & Southern Int'l Bank,* 486 F.Supp. 819, 827 (E.D. La.1980); *American Bell Int'l, Inc. v. Islamic Republic of Iran,* 474 F.Supp. 420, 426 (S.D.N.Y. 1979); *cf. Warner v. Central Trust Co., N.A.,* 715 F.2d 1121 (6th Cir.1983).

56. *Itek Corp.,* 730 F.2d at 24.

57. *See KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 15 (2d Cir.1979); *see also Cappaert Enterprises v. Citizens and Southern Int'l Bank,* 486 F.Supp. 819, 827 (E.D.La.1980).

58. *See Apple Barrel Productions, Inc. v. Beard,* 730 F.2d 384, 386 (5th Cir.1984).

59. *Itek Corp.,* 730 F.2d at 24.

60. *Sperry Int'l Trade, Inc. v. Israel,* 670 F.2d 8, 13 (2d Cir.1982).

let letter" on the bodice of the bank's customer.

Finally, the district court's conclusion that there is no adequate remedy at law in Ecuador is not supported by the record. The court's factual findings that Ecuador is not an impartial forum and that Enterprise International would "encounter significant resistance to a recovery of judgment against the Ecuadorian national oil company" also lack sufficient factual support in the record. The only relevant evidence on this issue is the testimony of the President of Enterprise International at the hearing on the preliminary injunction. He testified that he had encountered previous difficulties with C.E.P.E. when C.E.P.E. drew down a letter of credit that had been established to guarantee a crude oil contract with C.E.P.E. When asked whether he had encountered "any trouble" finding legal representation in Quito, Ecuador, he responded:

> I employed what was represented to me to be the best firm in Quito.... and when it was apparent after several months that nothing was going to be done and we were going to file suit against C.E.P.E., [the firm] withdrew from the case because of political problems. I then employed another firm which I have now.

This testimony falls far short of establishing that Enterprise International does not have an adequate remedy at law in Ecuador. The withdrawal of one law firm certainly is insufficient to show this, especially when the movant currently employs another law firm in the foreign forum. Moreover, the President of Enterprise International offered no explanation of the nature or the extent of the "political problems" that caused the withdrawal of his legal counsel and stated, during cross examination, that his company had not filed suit against C.E.P.E. in Ecuador. Thus, Enterprise International has not shown

that it does not "enjoy the prospect of a real ... opportunity to press its claims elsewhere," [61] or that resort to the courts of Ecuador would be futile.[62] Additionally, Belen-Enterprise itself agreed that the buyer's claims, which include the claims of C.E.P.E. here sought to be fended off, would be submitted to a designated Ecuadorian court. The record does not show any change in Ecuador's government or any reason why Belen-Enterprise should not be held to its contractual bargain. Even if the district court correctly interpreted the contract as requiring only the submission of C.E.P.E.'s claims to Ecuadorian courts and not as requiring the submission of Belen-Enterprise's claims to those courts, a matter we do not now review, the clause as thus limited implies an admission that resort to those courts would not be an empty gesture.

For these reasons, we hold that Enterprise International did not carry its burden of showing a substantial threat of irreparable harm and that the district court abused its discretion by granting the injunction.

### IV.

■ The district court correctly decided that the record does not permit it to decide whether it has jurisdiction over C.E.P.E. and ordered further discovery to enable the essential facts to be determined. Further proceedings against C.E.P.E. must await the jurisdictional decision, and we defer review of C.E.P.E.'s collateral estoppel claim until that decision is made.

### V.

■ The standby letter and the guarantee were due to expire on June 21, 1984, the day on which the district court heard argument on and granted the preliminary injunction. Unlike other courts that have faced the same problem,[63] the court did not condition its injunction on Enterprise International's extension of the standby letter

**61.** *Rockwell,* 719 F.2d at 586.

**62.** *See id.* at 587–88; *Itek,* 730 F.2d at 22; *Harris,* 691 F.2d at 1357.

**63.** *See, e.g., Harris,* 691 F.2d at 1346 n. 1; *Sperry Int'l Trade, Inc. v. Israel,* 670 F.2d 8, 11 n. 3 (2d Cir.1982).

and the guarantee or on its posting of a bond of equivalent value. By its action, the court failed to maintain the status quo and in effect, granted Enterprise International all of the relief it might have had on the merits. The district court's preliminary injunction also interfered with the parties' contractual arrangement, for it prevented C.E.P.E. from making the demand it might otherwise have made, prohibited Bank of America from acceding to that demand if made, and from in turn seeking recourse from First City National, and prevented First City National from honoring the demand on the standby letter.

Implicit in the district court's discretion under Rule 65(a) is the power to enter conditional preliminary relief if "securing the parties' rights until trial so requires." [64] Indeed, "it is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all." [65] A preliminary injunction, therefore, "should not grant relief properly awarded only in a final judgment," [66] and it is an abuse of discretion for the district court to issue a preliminary injunction "which permits one party to obtain an advantage by acting, while the hands of the adverse party are tied by the writ." [67]

Pursuant to our general equitable powers expressly conferred by statute [68] and in order to rectify the interference with the parties' contractual arrangement, we remand to the district court with the instruction that it shall issue an order vacating its injunction and giving all parties fifteen days within which to exercise their contractual rights under the standby letter and the guarantee. In doing so, because jurisdiction over C.E.P.E. has not yet been even tentatively established, we express no opinion concerning whether C.E.P.E. may properly demand payment of the full face amount of the letter of guarantee, $1,750,-000, when its asserted injury is only $269,-192.01. The preliminary injunction is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

---

64. 11 C. Wright & A. Miller, Federal Practice and Procedure § 2947, at 424–25 (1973).

65. *Id.* at 426 (quoting *Inland Steel Co. v. United States,* 306 U.S. 153, 157, 59 S.Ct. 415, 417–18, 83 L.Ed. 557, 560 (1939)).

66. *Diversified Mortgage Investors v. U.S. Life Title Ins. Co.,* 544 F.2d 571, 576 (2d Cir.1976); *see*

*also Triebwasser & Katz v. AT & T,* 535 F.2d 1356, 1360 (2d Cir.1976).

67. *Corica v. Ragen,* 140 F.2d 496, 499 (7th Cir. 1944).

68. *See* 28 U.S.C. § 2106; *cf. KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 17 (2d Cir. 1979).