NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0179n.06
Filed: December 20, 2004

No. 03-1952

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DIANE M. HENDRICKS; KENNETH A. HENDRICKS, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| COMERICA BANK, a National Banking Corporation; BANK OF AMERICA, N.A., a National Banking Corporation; | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants, | ) | |
| | ) | |
| MUTUAL INDEMNITY (BERMUDA), LTD., a Bermuda Corporation, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: Siler, Batchelder, and Rogers, Circuit Judges.

**Rogers, Circuit Judge.** Mutual Indemnity (Bermuda), Ltd. appeals from the district court's grant of a preliminary injunction which prevents Comerica Bank from honoring Mutual Indemnity's draws against letters of credit ("LOCs") obtained by plaintiffs Diane and Kenneth Hendricks. Because the plaintiffs failed as a matter of law to show irreparable harm, we vacate the preliminary injunction.

**I.**

In 1997, Diane and Kenneth Hendricks, owners of American Patriot Insurance Agency, set up the Roofers' Advantage Program, through which American Patriot could provide general liability, worker's compensation, and automobile liability insurance to roofing contractors through a single policy. The Roofers' Advantage policies were underwritten by a "Rent-A-Captive" program. In this case, American Patriot's program was totally underwritten by Legion Insurance Company. The complete details of this rent-a-captive scheme are not relevant to this appeal, but, by way of a general summary, Legion would receive the premiums, retain 10% for itself and transfer the remaining 90% to Mutual Indemnity. From the retained 10%, Legion would pay claims and expenses from the given year until that amount was exhausted. Mutual Indemnity was responsible for reinsuring claims exceeding this amount, but American Patriot was required to indemnify Mutual Indemnity for any losses exceeding the premium it received. The agreement was subsequently amended to place the indemnification liability on the Hendrickses personally, rather than on the company. The Hendrickses secured their obligation to indemnify Mutual Indemnity with irrevocable letters of credit. Legion obtained non-captive reinsurance for losses that exceeded the total premium generated.

Roofers' Advantage never turned a profit, however, and suffered massive losses. Cunningham-Lindsey, the company Legion retained to handle its claims, apparently had under-reserved the claims. The Hendrickses anticipated that Cunningham-Linsdey's claims handling problems would cause Legion to increase the premiums and make it more difficult to underwrite

policies. Because of these difficulties, Diane Hendricks met with the insurance companies to discuss whether it was appropriate to renew the program for another year.

Mrs. Hendricks and Lysa Saran, at the time chief operating officer of American Patriot, met with Eric Bossard, at the time a vice president at Legion, and James Agnew, a vice president at Commonwealth Risk, to discuss the future of the program. Mrs. Hendricks was particularly interested in her and her husband's potential liability for continued losses beyond the maximum Mutual Indemnity would pay in reinsurance. Bossard and Agnew indicated that they were unsure but that they would find out.

According to Bossard, he and Agnew met with officers of the affiliated insurance companies to discuss whether and to what degree the Hendrickses were personally liable for losses above Mutual Indemnity's limit. Bossard explains that, on learning that Legion—and not the Hendrickses—were responsible for those losses, Glenn Partridge, Executive Vice President of Legion, and Richard Turner, President of Commonwealth Risk, instructed Bossard and Agnew to tell the Hendrickses that they actually were personally liable for those losses. Bossard was instructed to tell the Hendrickses that in exchange for payment, Legion or Mutual Indemnity could obtain additional reinsurance to cap the Hendricks' potential liability. Thus, under Bossard's account, Legion and Mutual Indemnity were asking the Hendrickses to pay for additional insurance to cover losses that were not the responsibility of the Hendrickses, but rather were the responsibility of Legion. The Hendrickses agreed to pay Mutual Indemnity $1,000,000 for the additional reinsurance based on Bossard's statement.

The primary document setting out the terms of the parties' obligations was the Shareholder Agreement, between Mutual Indemnity Holdings (Bermuda), Ltd., an entity related to Mutual Indemnity, and American Patriot. This agreement contains a forum-selection clause stating that "[t]his Agreement has been made and executed in Bermuda and shall be exclusively governed by and construed in accordance with the laws of Bermuda and any dispute concerning this Agreement shall be resolved exclusively by the courts of Bermuda." The Hendrickses, however, claiming fraud, instituted an action in the Northern District of Illinois against Mutual Indemnity and other related entities. Simultaneously, the Hendrickses filed actions in the Eastern District of Michigan and the Central District of California in which they sought to enjoin the banks which held the letters of credit from honoring any attempts by Mutual Indemnity to draw on the LOCs. In Michigan and California the Hendrickses sought only injunctions; they did not sue Mutual Indemnity for fraud in those venues. The Central District of California and the Eastern District of Michigan quickly issued temporary restraining orders ("TRO") and ordered the parties to appear at preliminary injunction hearings.

The parties attempted to settle the case and Mutual Indemnity allowed the Hendrickses to audit the rent-a-captive program, but after eight months of talks, the settlement negotiations broke down. Once the negotiations ended, Mutual Indemnity sued the Hendrickses in Bermuda and moved to dismiss the three American lawsuits on jurisdictional and venue-based grounds. Acting first, Judge Ruben Castillo of the Northern District of Illinois dismissed the lawsuit in that district, holding that the forum-selection clause in the shareholder agreement required the Hendrickses to

pursue their claims against Mutual Indemnity in Bermuda. Judge Castillo noted that the Hendrickses never argued that they were fraudulently induced into accepting the forum-selection clause or that the clause was the product of unequal bargaining power, but that the Hendrickses simply argued that they would be denied their day in court if forced to litigate in Bermuda because Bermuda's bankruptcy laws were favorable to Mutual Indemnity. Judge Castillo explained that he was "unconvinced that Plaintiffs have no recourse against the Scheme [of Bankruptcy] in its present form such that they will be unable to litigate their claims in Bermuda and thus be deprived of their day in court if we enforce the forum selection clause."

A little less than two months later, however, Judge George King of the Central District of California granted the Hendrickses' request for a preliminary injunction. Without reaching the issue of whether the court had personal jurisdiction over Mutual Indemnity or whether venue was proper, Judge King concluded that he did have jurisdiction to enjoin the Bank of America from honoring draws against the letters of credit. Judge King further explained that the Hendrickses were likely to succeed in establishing material fraud and that they would suffer irreparable injury without an injunction because of Mutual Indemnity's "questionable financial circumstances."

Judge John O'Meara of the Eastern District of Michigan considered the Hendrickses' request for a preliminary injunction last. Judge O'Meara heard oral argument on the motion, and indicated that he was inclined to follow Judge King's ruling, but did not state any conclusions of law on the record and did not make a ruling on the motion. Nearly a month later, Judge O'Meara issued a written ruling, granting the preliminary injunction "for the reasons stated on the record at the hearing

held before this Court . . . and adopting as applicable to this matter the findings of fact and conclusions of law" contained in the transcript and ruling in the California case. In addition, Judge O'Meara ordered that the injunction would be dissolved if the plaintiffs either failed to prosecute their Seventh Circuit appeal diligently, or, in the event of an unsuccessful appeal, failed to commence an action in Bermuda within thirty (30) days on the same claims as the original Illinois action. On April 16, 2004, the Seventh Circuit affirmed the decision of Judge Castillo of the Northern District of Illinois dismissing the plaintiffs' case with regard to Mutual Indemnity, among others. On May 13, 2004, the Seventh Circuit denied the plaintiffs' petitions for rehearing and rehearing *en banc*. On June 16, 2004, the Hendrickses instituted an action against Mutual Indemnity and other related entities in Bermuda.

## II.

We determine that Mutual Indemnity has standing to appeal the injunction issued by Judge O'Meara against Comerica Bank, even though Mutual Indemnity was not itself enjoined. The Supreme Court has held that "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." *Marino v. Ortiz*, 484 U.S. 301, 304 (1988). Although Mutual Indemnity was not enjoined, it is a named defendant in this action. Furthermore, the injunction is clearly an adverse judgment, because it prevents Comerica from honoring Mutual Indemnity's draw against the letter of credit, and thus deprives Mutual Indemnity of access to the funds. "'[S]tanding to appeal is recognized if the appellant can show an adverse effect of the judgment, and denied if no adverse effect can be shown.'" *Ass'n of Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 403 (6th Cir.

2001) (quoting 15A Charles A. Wright et al., Federal Practice and Procedure: § 3902 (2d ed. 1992)).

The Hendrickses contend that just as certain nonparties may not appeal unless they have intervened, *see, e.g.*, *Wilkenson v. Hercules Engines, Inc.*, 138 F.3d 608, 611 (6th Cir. 1998), named parties who contest personal jurisdiction  should not be permitted to appeal.  The Hendrickses have not, however, provided any authority for denying standing to a *named* party.  Accordingly, Mutual Indemnity has standing to appeal, and we proceed to consider the issuance of the injunction.

Turning to the merits of the appeal, we conclude that the preliminary injunction must be reversed for failure of the plaintiffs to demonstrate irreparable injury.  This court reviews a lower court's decision to grant a preliminary injunction for abuse of discretion.  *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003).  Abuse of discretion can be found when the district court "improperly applie[s] the governing law, or use[s] an erroneous legal standard." *Id*.

There are four factors to be considered when issuing a preliminary injunction:

> (1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.

*Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  The factor at issue here is irreparable harm.  Judge King, and therefore through adoption Judge O'Meara, held that "there is also certainly a possibility of irreparable injury inasmuch as once released, the money

is likely as alleged to be dissipated in light of the questionable financial circumstances of the Mutual entity." The district court improperly issued a preliminary injunction preventing Comerica from honoring Mutual Indemnity's draw on the letter of credit, because, in the context of international letters of credit, the Hendrickses as a matter of law have not shown irreparable harm.

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573. In the context of an international letter of credit, there are particular concerns that make the issuance of a preliminary injunction even more extraordinary, and which accordingly require a clearer demonstration of exceptional circumstances. Although this court has not fully addressed the interplay between preliminary injunctions and international letters of credit, several other circuits have usefully laid out the relevant considerations. In particular, the approach of the Fifth Circuit in *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464 (5th Cir. 1985), has been widely adopted. *See, e.g.*, *Trans Meridian Trading Inc. v. Empresa Nacional de Comercializacion de Insumos*, 829 F.2d 949, 956 (9th Cir. 1987); *Foxboro Co. v. Arabian American Oil Co.*, 805 F.2d 34, 37 (1st Cir. 1986); *Fluor Daniel Argentina, Inc. v. ANZ Bank*, 13 F. Supp. 2d 562, 565 (S.D.N.Y. 1998). In *Enterprise International*, the Fifth Circuit first discussed the general principle that an injury is not "irreparable" unless "it cannot be undone through monetary remedies." 762 F.2d at 472 (internal quotation omitted). The court noted that this principle results in courts' refusing to enjoin the honoring of international letters of credit, because monetary loss is the only alleged harm. *See id.* at 473. The exceptions, the court noted, occurred in cases in which it was clear that the moving party would have no legal remedies at all, such as in

cases involving litigation in Iran immediately following the 1979 revolution and the taking of American hostages. *Id.* The fact that the prospect of relief in a foreign court is speculative is not enough to constitute a showing of irreparable harm. *Id.*

The Fifth Circuit went on to explain that

[t]his reluctance to grant preliminary injunctive relief in international letter of credit cases is well founded in policy and business practice as well as in equity. The obligations created by a letter of credit are completely separate from the underlying transaction, with absolutely no consequence given the underlying transaction unless the credit expressly incorporates its terms. This principle of independence provides the letter of credit with one of its peculiar values, assurance of payment, and makes it a unique device developed to meet the specific demands of the market place. . . . These features of letters of credit are of particular importance in international transactions, in which sophisticated investors knowingly undertake such risks as political upheaval or contractual breach in return for the benefits to be reaped from international trade. . . . Thus, in this context, the requirements for preliminary injunctive relief, including the showing of a substantial threat of irreparable injury if the injunction is not issued, are to be strictly exacted so as to avoid shifting the contractual allocation both of the risk of loss and the burden of pursuing international litigation.

*Id.* at 473-74 (internal quotations and citations omitted).

In the instant case, the only injury that the Hendrickses have alleged is monetary. Therefore, absent exceptional circumstances, their alleged injury is not "irreparable." And any such exceptional circumstances must overcome the policies disfavoring the issuance of injunctions in cases involving international letters of credit. The Hendrickses argue that they have met this burden by presenting evidence that Mutual Indemnity is insolvent, and that various related entities are also insolvent, which they primarily demonstrate through the introduction of the rehabilitation proceedings for Legion Insurance, a related entity. Without more, this does not constitute

extraordinary circumstances. Indeed, other courts have denied injunctions in cases in which it was unlikely that any foreign court could hear the underlying claim, a much more dire situation. *See Trans Meridian Trading Inc.*, 829 F.2d at 956 ("[W]here foreign courts provide even a potential legal remedy, injunctions are rarely issued . . . ."); *Enterprise Int'l, Inc.*, 762 F.2d at 473 ("[W]hen it has been shown . . . at worst, that access to foreign courts is speculative, injunctive relief has been refused."). Here, the chance that Mutual Indemnity is or will become bankrupt and will not be able to satisfy a judgment obtained against it presents less threat of irreparable harm than the chance that there will not even be a proceeding available in which to obtain that judgment. *See ANZ Bank*, 13 F. Supp. 2d at 564-65. In addition, the Hendrickses have not argued that they can never achieve a remedy in Bermuda courts. Because the Hendrickses have not demonstrated that their potential monetary injury constitutes an exceptional circumstance, they are not entitled to an injunction preventing Comerica Bank from honoring Mutual Indemnity's draws on the letter of credit. The district court's conclusion that an injunction could be based on a finding that "the money is likely as alleged to be dissipated in light of the questionable financial circumstances of the Mutual entity" was therefore an improper application of governing law.

Nor are the Hendrickses' remaining arguments persuasive. They argue that an injunction was appropriate because Mutual Indemnity has not demonstrated the validity of its claim to the funds. This argument ignores the very nature of a letter of credit—it guarantees payment apart from the merits of the underlying disputes. *See Enterprise Int'l, Inc.*, 762 F.2d at 474. The Hendrickses are free to litigate the merits of their fraud claim in Bermuda, but those merits are not relevant to the question before this court.

**III.**

Because the district court erred in granting an injunction due to the lack of a showing of irreparable harm, we do not need to reach the numerous other arguments advanced by both parties. Accordingly, the preliminary injunction is VACATED.